INDIANA TELEPHONE CORPORATION *v.* INDIANA BELL
TELEPHONE COMPANY, INC.

[No. 2-475A115. Filed December 30, 1976. Rehearing granted
March 7, 1977.]

*Claude M. Warren, Warren, Snider, Koeller & Warren,* of Indianapolis, *Samuel A. Fuller, Stewart, Irwin, Gilliom, Fuller & Meyer,* of Indianapolis, for appellant.

*Bruce N. Cracraft, Harold L. Folley,* of Indianapolis, for appellee.

SULLIVAN, J.—The Court below adjudged that money damages were owed the plaintiff, Indiana Bell Telephone Company, Inc. (Bell) by the defendant, Indiana Telephone Corporation (ITC). ITC appeals.

We affirm in part and reverse in part.

The suit was commenced on January 6, 1973, when Bell filed a complaint against ITC for injunctive relief and damages to recover money alleged to be due, plus interest thereon, in connection with a Traffic Agreement for the delivery of long distance (toll) telephone service and in connection with a Special Service Agreement for the delivery of private services.[1]

Although telephone companies in Indiana serve a specified geographic area, each is required to provide interconnections of equipment, lines, and services with the others to enable the delivery of services like long distance and special services. IC 8-1-2-5 (Burns Code Ed. 1973). Each company keeps a record of and collects the revenue from the calls or services

---

\* Judge Daugherty presided over the trial of the cause as regular judge of the Court. Following election and qualification of his successor, Judge Daugherty was appointed Special Judge for the purpose of ruling on the Motion to Correct Errors. TR. 63(A).

1. The private services are described as "full time, specially designed services tailor made to various customers for private lines . . . perhaps, a full time line between a home office in one city and a branch office in another."

it initiates and handles. Then all companies send the appropriate data to Bell. Bell acts as a clearinghouse because of its superior ability to handle the accounting procedures and because of its much larger proportionate share of the equipment, lines and personnel. On a monthly basis, Bell computes the amount each company owes other companies for the use of facilities in rendering the initiated service and issues billings accordingly. These transactions are called "settlements."

The method by which settlements are computed is specified by a contractual agreement between Bell and each independent company. In this case, ITC sought a change in the relevant contractual provisions and Bell would not agree. ITC began to delay payment of the settlements and eventually discontinued payment altogether under both the Traffic Agreement and the Special Services Agreement.

There are three basic functions involved in rendering toll service, namely, the "A" function (originating the call which involves the use of the telephone instrument, the local wire or cable and the local switching equipment), the "B" function (operating the call—either automatically or manually by the long distance operator—and timing and ticketing of the call), and the "C" function (the use of wire, cable or microwave reaching from the point where the call is placed to the place where the call is received—this function is frequently called "line haul" and represents the number of miles, or fractions thereof, of wire, cable or microwave that each telephone company furnishes for each toll call). The method for computing the "C" function is at issue.

Three different methods of computing settlements exist: (1) the "Nationwide Average Schedules", (2) full cost, and (3) a combination of full cost and the Nationwide Average Schedules.

The Nationwide Average Schedules represent costs developed from a study of 500 to 600 telephone exchanges (not

companies) located throughout the United States and owned and operated by independent telephone companies. The study is made by representatives of the Bell System and by representatives of the United States Independent Telephone Association. These nationwide average costs, based on the "average revenue per message", produce the amount of dollars to which each independent company is entitled in the settlements. The remaining revenue is retained by Bell.

"Full cost" is a method by which a single independent company makes a study of its own costs for each of the three functions involved in rendering service. This study is done in cooperation with Bell and requires the separation and allocation of expenses among (1) interstate toll service; (2) intrastate toll service and (3) local exchange service. Frequently, but not always, the costs of rendering toll service for an individual company are higher than the nationwide average costs and thus a full cost method often produces larger settlements to the independent. Under full cost settlements, the independent company recovers from the toll revenues all of its costs incurred in performing all three functions, ("A", "B", and "C") plus a profit. All of the independents in Indiana make settlements on the Nationwide Average Schedules method of computation, except four independent companies which utilize the full cost method.

Bell and ITC entered the Special Services Agreement in 1966, and entered the disputed Traffic Agreement on June 13, 1971. Later, ITC desired to change from the Nationwide Average Schedules, which was the method specified in both contracts, to the combination method using Nationwide Average Schedules on the "A" and "B" functions and "full costs" on the "C" function. On November 15, 1971, ITC delivered to Bell its "Separation Study," which embodied a cost study necessary to switch to the combination method. Bell would not agree to accept the cost study because it employed a method of accounting objectionable to Bell. As hereinbefore

noted, ITC began to defer payments and then cease payments on statements issued by Bell under both the Traffic Agreement and Special Services Agreement.

Bell, on January 6, 1973, filed its complaint with the trial court, alleging that ITC had breached the Traffic Agreement and the Special Services Agreement by virtue of its deferred and non-payments.

ITC subsequently filed a motion to dismiss the action in the trial court on the grounds that the matter was within the exclusive jurisdiction of the Public Service Commission. The motion was denied. On June 30, 1973, Bell filed a petition with the Public Service Commission which, in essence, asked the Commission to consider the disputed method of computing settlements. ITC requested the trial court to reconsider its motion to dismiss in light of the pending Commission action, but the motion was again denied. The Commission issued an order on January 11, 1974, that ITC resume payments based on the Nationwide Averages Schedules while further investigation was made and that pursuant to an agreement between the parties the contracts stood terminated as of January 1, 1974.

ITC resumed payments, and in the trial court, Bell dropped its request for injunctive relief but proceeded on its claim for damages.

The case went to trial without a jury on October 29, 1974, and on November 22, 1974 a judgment for Bell was rendered in the amount of $2,329,505.49. The trial court determined that the amount due on the Traffic Agreement was $1,717,-417.56 together with $194,148.52 pre-judgment interest and $381.65 per diem post-judgment interest accruing until the amount due be paid and determined that the amount due on the Special Services Agreement was $359,150.73 together with $48,200.17 pre-judgment interest and $78.72 per diem post-judgment interest. Corresponding credits held by ITC

against Bell were acknowledged in the amounts of $20,925.60 and $1,179.01.

## I.

## JURISDICTION OF COURT BELOW

ITC appeals from the judgment premised first on the contention that the trial court lacked jurisdiction over the subject matter of the case. It asserts that the money judgment, ascertained by using the method of settlements specified in the written contracts, was tantamount to a finding that such methods produced "reasonable compensation", hence the trial court usurped the exclusive jurisdiction of the Public Service Commission of Indiana to determine "reasonable compensation" as provided by IC 8-1-2-5 (Burns Code Ed. 1973).

The pertinent parts of the section upon which ITC relies read as follows:

". . . Every public utility for the conveyance of telephone messages shall permit a physical connection or connections to be made, and telephone service to be furnished, between any telephone system operated by it, and the telephone toll line operated by another such public utility or between its toll line and the telephone system of another such public utility, or between its toll line and the toll line of another such public utility, or between its telephone system and the telephone system of another such public utility, whenever public convenience and necessity require such physical connection or connections and such physical connection or connections will not result in irreparable injury to the owner or other users of the facilities of such public utilities, nor in any substantial detriment to the service to be rendered by such public utilities.

. . . The term 'physical connection' as used in this section, shall mean such number of trunk lines or complete wire circuits and connections as may be required to furnish reasonably adequate telephone service between such public utilities.

"(b) *In case of failure to agree upon such use or the conditions or compensation for such use,* or in case of failure to agree upon such physical connection or connections, or the terms and conditions upon which the same shall be made, any public utility or any person, association or corpo-

ration interested may apply to the commission and *if after investigation the commission shall ascertain that public convenience and necessity require such use or such physical connections,* and that such use or such physical connection or connections would not result in irreparable injury to the owner or other users of such equipment or of the facilities of such public utilities, nor in any substantial detriment to the service to be rendered by such owner or other public utilities or other users of such equipment or facilities, *it shall by order direct that such use be permitted and prescribe reasonable conditions and compensations* for such joint use and that such physical connection or connections be made and determine how and within what time such connection or connections shall be made, and by whom the expense of making and maintaining such connection or connections shall be paid.

"(c) Such use so ordered shall be permitted and such physical connection or connections so ordered shall be made and such conditions and compensation so prescribed for such use; [,] and such terms and conditions upon which such physical connection or connections shall be made, as so determined, shall be lawful conditions and compensations for such use, and the lawful terms and conditions upon which such physical connection or connections shall be made, to be observed, followed and paid, subject to recourse to the courts upon the complaint of any interested party as provided in sections seventy-eight to eighty-six, inclusive,[2] and such sections so far as applicable, shall apply to any action arising on such complaint so made. *Any such order* of the commission *may be from time to time revised* by the commission upon application of any interested party or upon its own motion. [Acts 1913, ch. 76, § 8, p. 167; 1933, ch. 190, § 3, p. 928; 1935, ch. 293, § 2, p. 1447.]" (Emphasis supplied).

We read this section to be an expression of Indiana's lawmakers that the public interest requires telephone communication be available to the Indiana consumer without the interruption of service which might come about as a result of disagreements between the various telephone companies over the interconnection of their lines, equipment and services. *See,*

---

2. For present provisions see IC 8-1-3-1—8-1-3-12. Sections 84 and 86 are compiled as IC 8-1-2-73, 8-1-2-74. These sections pertain to judicial review of Commission actions.

*McCardle* v. *Akron Telephone Co.* (1923), 87 Ind. App. 59, 156 N.E. 469, 160 N.E. 48.

This statutory section delegates authority to the Public Service Commission to order such interconnection where telephone companies are unable to agree between themselves to do so. *See, Northern Indiana and Southern Michigan Telegraph and Cable Co.* v. *Peoples Mutual Telephone Co.* (1916), 184 Ind. 267, 268, 111 N.E. 4.

In this construction we are bound by the well-settled principle that the Commission derives its power and authority solely from the statute, and unless a grant of power can be found in the statute, it must be concluded that there is none. *General Telephone Co. of Indiana* v. *Public Service Commission* (1958), 238 Ind. 646, 154 N.E.2d 372, 373; *Town of Merrillville* v. *Lincoln Gardens Utility Co.* (1976), 170 Ind. App. 245, 351 N.E.2d 914, 919. We note that the quoted statutory section specifically addresses the "failure to agree upon such use or the conditions or compensation for such use." Only then is the Commission authorized to order a connection or to order conditions or compensation for a connection. *See, Northern Indiana Telephone Co.* v. *United Telephone Companies* (1939), 215 Ind. 396, 19 N.E.2d 940, 941. Since ITC and Bell had voluntarily entered a written agreement, the cited section is without application. In fact, the parties have provided interconnections for many years under various contractual arrangements, and the present dispute was brought before the trial court by Bell on the complaint that ITC had breached the terms of the existent written contracts by its non-payment and deferred payment of the settlements.

Therefore, the question submitted to the trial court involved the breach of a voluntary contract. The construction and breach of such contracts are matters for judicial determination. The Public Service Commission does not have jurisdiction of such matters. *See, In Re Gumm* (1949), 118 Ind. App.

695, 83 N.E.2d 487, 488. It has no authority to adjudicate a breach of contract action or to grant a money judgment. *State ex rel. Indianapolis Water Co.* v. *Niblack* (1959), 240 Ind. 32, 161 N.E.2d 377, 378; *See, Town of Merrillville* v. *Lincoln Gardens Utility Co. supra,* at 919.

An order of the Commission is an administrative order, not a judgment, *Valparaiso Lighting Co.* v. *Public Service Commission of Indiana* (1921), 190 Ind. 253, 267, 129 N.E. 13, and, any order it might make with regard to settlements, like rates, must be prospective in nature, fixing compensation for the future but not for the past. *Public Service Commission* v. *City of Indianapolis* (1956), 235 Ind. 70, 131 N.E.2d 308, 315; *Boone County Rural Electric Membership Corp.* v. *Public Service Commission* (1959), 239 Ind. 525, 159 N.E.2d 121, 125; *Indiana Telephone Corp.* v. *Public Service Commission* (1960), 131 Ind. App. 314, 171 N.E.2d 111, 124.

We find the following language to be apt:

> "A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial, in kind. . . . ."

> *Prentis* v. *Atlantic Coast Line Co.,* (1908), 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150, 158, 159 (quoted in dissenting opinion of J. Emmert in *State* v. *Marion Circuit Court* (1952), 230 Ind. 277, 103 N.E.2d 214, 216).[3]

---

3. There is perhaps a practical middle ground where matters of this nature are, depending upon the manner of their presentment, subject to the jurisdiction of the administrative agency as well as to the jurisdiction of the court of law. Perhaps a variant of the judicial abstention doctrine would prove advantageous. Under such doctrine, even though a party might properly bring a civil lawsuit for damages, the issues underlying that claim might better be resolved by the agency whose expertise is more properly suited to the consideration and the decision on those issues. In such instance, the court might consciously abstain from decision until the agency has had opportunity to make its determination. Such a case might have been presented to the trial court here if the parties had provided interconnections absent a contract

ITC correctly observes that all contracts are made subject to the relevant statutory laws of the state. Therefore, the contracts in question were certainly subject to such modification as the laws of Indiana sanction the Commission to make. Our Supreme Court has, however, limited the impact on a contract that legislative modification may make:

> "The state through its legislative department of government may pass all laws and regulations respecting the peace, the safety, the health, the happiness, and the general wellbeing of the people of the state; and, under this power, it may prescribe the conditions under which persons and corporations engaged in furnishing utility service to residents of the state may do business and may fix the rates to be charged for such service."

\* \* \*

> "In accordance with the same principle, the courts, also hold that all contracts made for services to be furnished by public utilities must be regarded as made in contemplation of the regulatory power of the state, and that, when the state exercises such power by changing rates or conditions of services, *such change does not impair the obligations of existing contracts,* although such contracts must yield to the changes so made." (Emphasis supplied). *Central Union Telephone Co.* v. *Indianapolis Telephone Co.* (1920), 189 Ind. 210 at 219 and 227, 126 N.E. 628.

In determining whether a contract between two telephone companies as to the routing of toll calls was a valid and binding obligation between the parties, the Appellate Court in *Home Telephone Co.* v. *North Manchester Telephone Co.* (1911), 47 Ind. App. 411, 421, 422, 93 N.E. 234 said:

> "However, under the judgment in this case, we may concede, without deciding, that so far as appellee seeks to enforce this provision of the contract, without regard to the convenience to the public, it must fail; and may also concede the rule to be that the public is entitled to the best, most convenient and least expensive service available, and that appellant cannot be compelled to comply with

or a Commission order fixing the settlements. Although only the court could grant a money judgment in such circumstances, it might better await action by the Commission fixing a method of computing the settlements from which the judgment could be calculated.

the terms of its agreement with appellee, in violation of this public right. *It yet remains clear that appellant should not be permitted to disregard the terms of this contract, when such disregard does not involve a violation of this public right* . . . .

The contract in question, so far as it does not affect the public, is fair and within the power of the contracting parties to make, and thus far it can, and in all fairness should be enforced." (Emphasis supplied).

Defendant ITC was bound by the terms of compensation (settlements) to which it agreed, or to terms of compensation as they might have been prospectively modified by the Public Service Commission in the public interest. If ITC felt that the compensation term was modifiable within the purview of the Public Service Commission Act, its recourse was to show appropriate grounds for sustaining such a petition before the Public Service Commission rather than to withhold payment to Bell in breach of its contract.

While we hold that under the circumstances of this case, IC 8-1-2-5 had no application, it is within contemplation that a provision in a contract between two utility companies could impair the ability of one or both to serve the public to a degree which would properly subject the matter to the jurisdiction of the Public Service Commission. For example, in addition to those sections of the Public Service Commission Act [IC 8-1-1-1 *et seq.* (Burns Code Ed. 1973)] which give direct authority to control specific utility transactions, collateral matters have often been brought before the Commission because of their indirect effect on rate establishment and therefore have been found to be within proper consideration of the Commission.[4]

---

4. The following citations are representative but not exhaustive: IC 8-1-2-6 (Burns Code Ed. 1973) (valuation of property as affecting rates) *Public Service Commission v. Ind. Bell Tel. Co.* (1955), 235 Ind. 1, 130 N.E.2d 467; *Public Service Commission v. City of Indianapolis* (1956), 235 Ind. 70, 131 N.E.2d 308; IC 8-1-2-19 & 20 (Burns Code Ed. 1973) (method of depreciation affecting rate making) *Public Service Commission v. LaPorte* (1935), 207 Ind. 462, 193 N.E. 668; IC 8-1-2-48 (Burns Code Ed. 1973) (excessive salaries, employees, and other items of expense affecting rates); (taxation funds affecting rates) *Boone Co.*

In this case, Commission hearings and orders which predated the court proceedings reflect the Commission's recognition that the matter of settlements is integrally related to rate establishment. *See*, fn. 5, *infra*. While long distance rates are required to be consistent throughout the State of Indiana, a given company's rate of return will be affected by its settlements for long distance services with other companies. Since a company's rate of return is a pivotal factor in determining rates, the long distance settlements to which a company agrees may affect rate establishment indirectly. Whether such condition exists between the parties to this action is a matter properly determined by the Public Service Commission. IC 8-1-2-4, 42, 54, 58, 61, 69, 83, 113 (Burns Code Ed. 1973). That determination however, as we have held here, may not control the resolution of common law disputes.

If such circumstances were to exist as would properly put the matter of settlements before the Commission, the order of the Commission would nonetheless have only a prospective effect and would work a modification of the terms of the contract only from the entry of the Commission's order. Any breach of contract resulting from non-payment before or after the order could be redressed only in a court of law. In a case like the one before us, damages for a breach which occurred before such Commission entry are measured by the settlements provision existing before the entry. In another case, a breach might be found to occur (or to continue) after such a Commission entry, in which case the damages would be measured at least in part by the provision as modified by the Commission entry. In no event could the Commission adjust the contract provision retrospectively, and any party injured by non-payment could recover only by proceeding in the judicial forum. *Cf. Chenango & Unadilla Telephone Corp.*

*Rural Elec. Membership Corp.* v. *Public Service Commission* (1959), 239 Ind. 525, 159 N.E.2d 121; *Evansville* v. *Southern Ind. Gas & Elec. Co.* (1975), 167 Ind. App. 472, 339 N.E.2d 562.

v. *Public Service Commission* (1975), 46 A.D.2d 601, 364 N.Y.S.2d 578.

Upon the petition of Bell, the Commission did hold a hearing with respect to the issue of settlements and on January 11, 1974, entered an interim order that the contract stand terminated by mutual agreement of the parties, and that the parties maintain their present interconnections of service, and that ITC resume payment of settlements in accordance with the contract method until such time as further testimony could be taken and investigation made by the Commission to adjust future settlements, if necessary. But since ITC, pursuant to the January 11, 1974, Commission order, did resume payment, the non-payment and deferred payment for which Bell asked redress and for which the court granted damages covered a period unaffected by the interim order[5] or any subsequent order of the Commission which might have worked a modification of the settlement arrangement.

The trial court properly exercised its jurisdiction.

---

5. ITC argues that the court below lacked jurisdiction in that such order was not final. This argument presupposes exclusive jurisdiction of the subject matter to be in the Commission subject only to judicial review, and, in accordance with the reasoning stated in the body of this opinion, the finality or lack thereof of such order is irrelevant to *this* cause of action.

In addition to the fact that the interim order had only a prospective effect and therefore did not alter the measure of damages in this case from the voluntary contract terms, we also note that the Commission had held hearings in the year prior to the execution of the traffic contract here in question for the purpose of considering long distance rates and the role of settlements in the standardization of such rates for all telephone companies operating in Indiana. The method of computing settlements, which these parties included in their written contract (within a year after those Commission hearings and orders), is a method which was approved by the Commission in those proceedings. Moreover, since the contract terms remained subject to modification by Commission action, if ITC felt such a method impaired its ability to serve its consumers, it should have petitioned Commission intervention rather than withhold payments from Bell.

## II.

## TERMINATION OR SEVERABILITY OF CONTRACT PROVISIONS

ITC argues that the written contracts were terminated prior to the January 1, 1974 date to which the parties stipulated for purposes of the Public Service Commission hearing.

If ITC is correct that earlier termination occurred, the situation of these parties after the date of such termination would then have put them within the contemplation of IC 8-1-2-5, *supra*. Undoubtedly, a complete termination of interconnections would have presented an emergency situation for the Commission. *Twin City Realty Corp.* v. *Clay Utilities, Inc.* (1970), 146 Ind. App. 629, 257 N.E.2d 686, 694, 697. This was not the case, for the parties continued to perform the contracts with the exception of ITC's nonpayment and deferred payment. However, ITC proposes alternatively that the settlements provisions were severable and were terminated without terminating the entire contract.

The relevant contract provisions concerning termination read as follows:

TRAFFIC AGREEMENT, EXECUTED JULY 13, 1971—
"Unless sooner terminated as herein provided, this Agreement will continue in force for a period of one year from date of execution hereof *and thereafter, unless terminated by thirty (30) days' prior notice* in writing from either company to the other."

SPECIAL SERVICES AGREEMENT, EXECUTED MAY 25, 1966—
"This agreement will continue in force for a period of one year from date of execution and thereafter *until terminated by sixty (60) days' prior notice* in writing from either company to the other." (Emphasis supplied).

Bell argued below that the required notice was never given by ITC. ITC argued that notice was given by virtue of a

custom and practice[6] in the trade, namely (1) correspondence indicating its desire to change the method of computing settlements and/or (2) delivery of its "cost basis" study to Bell.

We do not reach the question of severability because we find no error in the trial court's following special findings that the contract clauses were not terminated:

"14. The defendant has at no time taken any action to cancel either the Traffic Agreement or the Special Services Agreement by providing written notice of cancellation as provided under the terms of such agreements. Defendant moreover has at no time expressed any intention or desire of cancelling either of the two contracts.

. . . .

21. The parties agreed to no cancellation, amendment, or other modification of the Traffic Agreement, which is the subject of Count I, and no action was taken to cancel, amend, or otherwise modify the Traffic Agreement, which is the subject of Count I.

22. No action was taken by the parties to cancel, amend, or otherwise modify the Special Services Agreement, which is the subject of Count II of the Complaint.

. . . .

24. The defendant attempted to prove a custom in the industry establishing that independent telephone companies could, by unilateral action, undertake a cost study and effectively terminate a portion or all of a toll traffic agreement upon completion and submission of the study. The only fact established with regard to such subject was that independent and Bell companies can, by agreement, enter into a new settlements contract arrangement based upon a cost study submitted to and acceptable to the Bell company.

25. The unilateral substitution of a cost study unacceptable to Indiana Bell to replace the "C Schedule" (line haul) portion of the Traffic Agreement, or the termination of only the line haul portion of the Traffic Agreement is not in accord with industry practice, is not contemplated by the

6. Appellee Bell briefed an argument below and on appeal proposing that the use of parol evidence to show custom and usage altering the unambiguous terms of a contract would be error. In light of our opinion herein, error, if any, has not prejudiced Bell and therefore is harmless. Consequently, we do not lengthen this opinion with a disposition of the issue.

terms of the Traffic Agreement, and would contradict and vary the existing terms of the Traffic Agreement."

ITC stakes its claim to termination first upon correspondence between Bell and ITC. Those letters offered as exhibits contain no express notice of termination. Instead, they evidence the disagreement between the parties as to the manner in which ITC was preparing its cost study. In fact, ITC's own expert witnesses testified that the custom and usage in the telephone industry was that when a cost study is delivered to a "Bell System" company by an independent telephone company, the *parties agree* to a new contract which is executed in writing, and the payments made by the independent are computed on the new cost basis retroactively to the date upon which the cost study was delivered to Bell. The witnesses could cite no instance in which this practice was followed when there was disagreement between the parties over the cost basis. Therefore, the custom and usage upon which ITC relies does not include circumstances of the sort presented in this case. Furthermore, the crux of the disagreement here was a particular accounting method utilized by ITC and objectionable to Bell from the inception of ITC's study. ITC was unable to adduce testimony of any instance in which this particular accounting method had been used in which Bell and an independent company had agreed to and executed a new contract based on a cost method of computing settlements. We are unable to find evidence in the record which would controvert this evidence or the concomitant findings of the trial court. Accordingly, we find no error in the trial court findings.

ITC makes a supplementary argument that its breach by deferred and non-payment was induced by Bell's behavior in withholding settlements under a "Jasper-Evansville Microwave" facility agreement and in making a "catch-up" payment later without including interest.

The trial court found:

"27. By its terms the Traffic Agreement, at page 3 of Exhibit A, excluded the settlement for defendant's Evansville-Jasper microwave facilities and such facilities were to be the subject of a separate agreement between the parties outside the settlement respecting the Evansville-Jasper microwave facilities, but the plaintiff has made interim payments to the defendant for such facilities, and such payments commenced within thirty days from receipt by plaintiff of the cost information needed in order to compute the interim payments. Since the Evansville-Jasper microwave controversy is not one of the contract issues before this Court, the Court's decision of the issues herein will have no effect upon the rights of the parties in respect to defendant's Evansville-Jasper microwave facilities."

We find no evidence in the record to negate this finding. Rather, the evidence of record supports it. In the finding of fact, we therefore perceive no error to have been committed by the trial court.

Although it is unclear whether ITC intends that this allegation be considered as an excuse for its own breach or in mitigation of damages, the assertion fails for lack of proof. Under the circumstances of this case, the appropriate disposal of any such allegation might have been made by counterclaim pursuant to Indiana Rules of Procedure, Trial Rule 12, or by a separate cause of action.

Therefore, we affirm the conclusion reached by the trial court that ITC breached the terms of the contract, and we hold that the money judgment was appropriately granted.

## III.

## DAMAGES

The balance of the alleged errors presented by ITC on appeal relate to the trial court's determination of damages.

The measure of damages employed by the trial court included (1) the amount equal to Traffic Agreement settlements and Special Services settlements which ITC did not pay be-

ginning mid-1972 through January, 1974, plus (2) interest[7] computed from the time that each non-paid settlement was due (30 days after billing) to the time of judgment and (3) the amount equal to interest computed for the period of time each deferred settlement was outstanding (30 days after billing) until it was paid, plus (4) interest on such amounts computed from the time the deferred settlement was paid to the time of judgment. In addition, post-judgment interest was allowed for both the non-payments and the deferred payments.[8]

ITC urges error (1) for the assessment of interest on the settlements it left unpaid, (2) for the assessment of interest covering periods of deferral on payments, (3) for the assessment of "interest on such interest," and (4) for the appointment of a due date measured thirty (30) days from the date of each billing.

## (A) ASSESSMENT OF PRE-JUDGMENT INTEREST ON UNPAID SETTLEMENTS

Because the Traffic Agreement and the Special Services Agreement contain no stipulations that interest shall be charged in the event of non-payment or deferred payment, ITC asks us to hold that pre-judgment and post-judgment interest should not have been levied.

ITC also argues that there exists a custom and practice in the telephone service trade "not to pay interest on principal amounts owed by one company to another." There is no testimony or evidence to support this claim. The testimony which ITC misconstrues to support its claim is the statement of one witness, a Bell employee, that he knew of *no custom or practice which allowed* for the computation of interest but that

---

7. Each reference to "interest" means interest computed on a straight 8% per annum basis.

8. ITC does not contest post-judgment interest per se. It merely contests post-judgment interest insofar as it is computed upon disputed amounts within the judgment itself.

he prepared the computations on the advise of counsel. There is a great deal of difference between "no custom to pay"; and "a custom not to pay." Bell, however, relies for its claim to such interest on IC 24-5A-1-3 (Burns Code Ed. 1974).[9]

> "Date from which interest allowed.—Interest at the rate of eight per cent [8%] per annum shall be allowed:
>
> . (a)   From the date of settlement on money due on any instrument in writing which does not specify a rate of interest and which is not covered by [24-4.5-1-101—24-4.5-6-203, 24-5-3A-1, 24-5-6A-1, 24-5A-1-1, 24-5A-1-3] ;
>
> (b).   And from the date an itemized bill shall have been rendered and payment demanded on an account stated, account closed or for money had and received for the use of another and retained without his consent. [Acts 1971, P.L. 366, § 10(5), p. 1557.]"

ITC contests the application of this section on the basis it pertains to "liquidated claims, while this case involves the discovery of alleged indebtedness arising from a disputed claim." We must decline to agree since Indiana authority sufficiently amplifies that the crucial factor in allowing interest is whether the damages were ascertainable in accordance with fixed rules of evidence and accepted standards of valuation, not whether damages were liquidated. *New York, Chicago & St. Louis Railway Co.* v. *Roper* (1911), 176 Ind. 497, 506, 96 N.E. 468; *Hirsch* v. *Merchants Nat'l Bank & Trust Co. of Indiana* (1975), 166 Ind. App. 497, 336 N.E.2d 833, 838; *Portage Indiana School Construction Corp.* v. *A. V. Stackhouse Co.* (1972), 153 Ind. App. 366, 287 N.E.2d 564, 567.

Where the terms of the contract make the claim ascertainable and the amount of the claim rests upon mere computation, pre-judgment interest computed from the time the principal amount was demanded or due is allowable at the permissible statutory rate, in the absence of an express contractual provision specifying the interest rate. *Independent Five & Ten Cent Store* v. *Heller* (1920),

---

9.   This provision is now IC 24-4.6-1-103 (Burns Supp. 1976).

189 Ind. 554, 561, 127 N.E.2d 439; *City of Vincennes* v. *Mc-Carter* (1968), 142 Ind. App. 493, 236 N.E.2d 76, 77; *Kuhn* v. *Powell* (1915), 61 Ind. App. 131, 133, 111 N.E. 639.

## (B)   DAMAGES FOR DEFERRAL OF PAYMENTS MEASURED IN INTEREST

ITC has overlooked legal authority concerning the measure of damages for late (deferred) payment. Our Supreme Court has adopted the following position:

> "When one is indebted to another and fails to pay the same when due, the damages for the delay in payment are provided for in the allowance of interest. This is the measure of damages adopted by the law in all actions by the creditor against the debtor. *Loudon* v. *Taxing District* 104 U.S. 771; *Insurance Co.* v. *Piaggio,* 16 Wall (U.S.) 378; *Greene* v. *Goddard,* 9 Metc. (Mass) 212, 232; 5 Am. and Eng. Ency. of Law, p. 27, and note, 2, p. 25." *Lowe* v. *Turpie* (1896), 147 Ind. 652, 671, 44 N.E. 25; *see also Kuhn* v. *Powell, supra* at 135.

Therefore, damages for the deferred payments were correctly assessed by the trial court.

## (C)   ASSESSMENT OF PRE-JUDGMENT INTEREST ON DEFERRED PAYMENTS CHALLENGED AS "INTEREST ON INTEREST"

Since the interest assessed for the period from the date each deferred settlement was due to the date it was paid represents the damages for delay in payment, it is somewhat misleading to frame an argument in terms of "interest on interest." The trial court actually assessed the *damages* for the late payments and then allowed statutory interest on the amount of these damages pursuant to IC 24-5A-1-3 (Burns Code Ed. 1974).

It is here appropriate to note that the computation of damages and the need to impose interest to accomplish full com-

pensation to the injured party are matters within the discretion of the trial court if supported by evidence of record. *Valcan Corporation* v. *M. T. Sparks, Inc.* (1968), 143 Ind. App. 543, 241 N.E.2d 862, 865.

We see no reason why full compensation should not include a sum which the amount of money damages for late payments would presumably have earned in the hands of the injured party. However, like the allowance of interest on any other ascertainable amount owing, we must follow legal precedent by requiring that the plaintiff must have made a demand for payment or have performed some act which is sufficient to constitute a demand. *See, Marsteller* v. *Crapp* (1878), 62 Ind. 359, 361; *Kuhn* v. *Powell, supra* at 135. Additionally, the statutory provision which authorizes the imposition of interest requires a demand. IC 24-5A-1-3 (Burns Code Ed. 1974). Since the contractual provisions are devoid of reference to compensation for late payment (i.e. late charges), the contracts standing alone are insufficient to constitute demand. Furthermore, there is no evidence that any other demand for late charges was made by Bell via correspondence, billing, or otherwise. Nonetheless, it would be within the discretion of the trial court to conclude that when Bell's complaint was filed with the court a demand occurred.

Therefore, to the extent that the interest on damages for late payments reflects a period of time prior to the date the complaint was filed, the money judgment is excessive and must be amended.

Otherwise, we find no error or abuse of discretion on the part of the trial court in assessing damages.[10]

---

10. When damages were assessed, ITC held credit memoranda issued to it by Bell, which memoranda were allocable toward any indebtedness to Bell. ITC argues that the amount of these memoranda should have been allowed as offset against damages, thereby reducing the amounts upon which interest was calculated. These memoranda are not in the nature of a counterclaim or setoff which would effect the advocated result. Furthermore, ITC has waived greater consideration on this issue for failure to include it in its Motion to Correct Errors.

## (D) APPOINTMENT OF DUE DATE MEASURED THIRTY (30) DAYS FROM DATE OF BILLING

The Traffic Agreement embodied a written provision requiring full remittance on settlement statements by the debtor company within thirty days of billing; however, the Special Services Agreement contained no provision of this type. The trial court found that:

". . . The parties have, by their conduct, recognized that a period of thirty days is reasonable for payment of statements rendered under the Special Services Agreement. . . ."

Bell representatives testified that it was an established practice in the telephone industry to remit payment within thirty days of billing. This testimony and other testimony regarding the course of dealing between the two companies provide sufficient basis for the trial court finding.

Appellant ITC essentially asks us to reweigh the evidence and presents no issue of law upon which to challenge the trial court action. Therefore, we will not disturb the trial court finding that a period of credit existed after each billing (demand) for the principal amounts and that damages could be imposed from the date the period of credit was at an end.

Since we find no error, save the assessment of some prejudgment interest on the damages for late payment of settlements, we remand the cause to the trial court for the limited purpose of modifying the money judgment in accordance with this opinion.

Bell has moved for assessment of an additional 10% in damages pursuant to Indiana Rules of Procedure, Appellate Rule 15(G). There is no showing that ITC's appeal was taken in bad faith or that it is wholly frivolous or without merit. Accordingly, the motion is denied. *Marshall* v. *Reeves* (1974), 262 Ind. 403, 316 N.E.2d 828, 829.

Affirmed in part; reversed in part; and the cause remanded for modification of judgment in conformity with this opinion.

Buchanan, P.J. and White, J., concur.

NOTE.—Reported at 358 N.E.2d 218.

----

OPINION ON PETITION FOR REHEARING

SULLIVAN, J.—Appellee, Indiana Bell Telephone Company (Bell), has filed its Petition for Rehearing for the sole purpose of allowing this Court to rectify what is alleged to be an erroneous statement of law. Bell does not seek further modification or correction of the judgment below, because following our decision of December 30, 1976, the parties made full settlement with respect to the matters in controversy. Notwithstanding the latter fact, we deem it necessary to reexamine those matters heretofore decided in Part III (C) of our December 30, 1976 opinion [*Indiana Telephone Corp. v. Indiana Bell Telephone Co.* (1976), 171 Ind. App. 616, 358 N.E.2d 218].

In that opinion we were concerned with the trial court's computation of damages 1) for payments which Indiana Telephone Corp. (ITC) never remitted to Bell (non-payments), and also 2) for payments which ITC wrongfully withheld from Bell for certain periods of time (deferred payments).

As to non-payments we upheld the trial court's allowance of damages in the full amount left unpaid plus pre-judgment interest thereon [See Part III (A)]. Pre-judgment interest is sanctioned not only by Indiana case law, but also by IC 24-4.6-1-103 (Burns Supp. 1976), which states that interest shall be allowed "from the date an itemized bill shall have been rendered and payment demanded on an account stated . . ."

As to deferred payments we upheld the trial court's allowance of damages for the deferral, measured in the simple interest such amounts would have drawn over the period of deferral. [See Part III(B)]. We then disallowed pre-

judgment interest on the damages for deferral inasmuch as no demand for the payment of *principal,* (that is, simple interest in the form of damages), had ever been made by Bell until it filed its complaint. Pre-judgment interest on a principal amount composed in part of simple interest was challenged by ITC as "interest on interest", and we erred in our conclusion that it was not. We arrived at our decision by analogy to the prerequisites for the allowance of pre-judgment interest on other principal amounts outstanding at judgment. *Marsteller* v. *Crapp* (1878), 62 Ind. 359; *Kuhn* v. *Powell* (1916), 61 Ind. App. 131, 111 N.E. 639; IC 24-4.6-1-103 (Burns Supp. 1976).

The existence or non-existence of a demand for the principal amount owing has no relevance to the proper resolution of this case at Part III (C), and we must now recant that portion of our holding.[1]

Bell's Petition for Rehearing prompted our search for a more satisfactory resolution of the issue and led us to the following commentary:

> "In regard to compound interest, or interest on interest, there has existed much doubt and difference of opinion. It was rigorously prohibited by the Roman law: *Nullo modo usurae • usurarum a debitoribus exigantur.* The English law followed in the same track. So in an early case in chancery, Lord Cowper held a clause in a mortgage, that if the interest was behind six months, then it should be accounted principal and compound interest, was 'void and of no use;' 'that to make interest principal, it is requisite that it be grown due, and then an agreement concerning it may make it principal.' It is not regarded as

1. In its Petition for Rehearing, Bell asserts that our discussion of demand for principal, in the form of "late charges", would create a duty upon creditors to demand both "payment of the bill and payment of the interest as well." IC 24-4.6-1-103 allows compensation to the creditor for his lost use of money which has been wrongfully withheld from him. The demand which is required is a demand for the *principal* sum as a matter of notice to the debtor. If interest sought is to be computed upon an amount which has been transformed from simple interest into additional principal by virtue of a lawful agreement between the creditor and the debtor, a demand for the increased principal must be made.

within the statutory prohibition of usury, but as leading to oppression and abuse. So Lord Eldon has said, 'There is nothing unfair or perhaps illegal in taking a covenant, originally, that if interest is not paid at the end of the year, it shall be converted into principal. But this court will not permit that, as tending to usury, though it is not usury.' "

\* \* \*

". . . [I]n a subsequent case, the . . . learned judge laid down the rule that 'compound interest cannot be demanded and taken, except upon a special agreement made after the interest has become due' . . . ."

"So in ascertaining the amount due on a note made payable with interest annually, simple interest only is to be computed; and interest on the interest will not be allowed. But if a new note is given for the interest, it is thereby converted into capital, and it may be given with interest."

"WHERE ALLOWED.—An exception has been, however, introduced by the usages of modern trade to the general rule which denies compound interest. As between merchants upon their mutual accounts, it is the custom to cast interest upon the several items, and to strike a balance at the end of the year of the items of principal and those of interest, and to carry the footing of the two to a new account, as forming the first item of principal for the ensuing year. In this manner, yearly rests, as they are called, have for a long time been made and acquiesced in by the mercantile world. But after the mutual trade and dealings have ceased, the right to make annual rests ceases; and in the absence of any specific agreement, the creditor is allowed simple interest only on the balance of his account; the right to make the yearly rests growing out of the mutuality of the debts and credits; and the allowing of interest on each side."

"Another exception to the general rule denying compound interest grows out of the conduct of the defendant; where that is grossly delinquent or intentionally contrary to his duty, compound interest is sometimes inflicted by way of punishment. Where partial payments have been made in cash, or by rents and profits, or otherwise, the payments are to be first applied to the satisfaction of the interest then due, and the balance only is to go towards the reduction of the principal."

SEDGWICK, DAMAGES, 473 (6th ed. 1874), *See also* SEDGWICK, DAMAGES (9th ed. 1920); McCORMICK, DAMAGES, § 53 (1935); 27 ALR 81.

It is also said that because of courts' hostility to compound interest, only the equivalent of simple interest will be assessed as damages and compound interest will not be allowed. McCORMICK, *supra,* § 53 at 212. Other than the exceptions allowed by some jurisdictions for trade custom or express contract provisions, the above-cited statement apparently still reflects the majority position. Current authorities so state:

> "The general rule is that compound interest is not allowed as damages. Logically, it would seem that *if a note or other pecuniary obligation is payable with interest annually or at other stated periods,* and there is default extending over several interest periods, the promisee should recover interest not only on the principal sum but on the various broken obligations to pay interest. Such, however, is not the general rule of law."

WILLISTON, CONTRACTS, § 1417 (3d ed. 1968) ; *see also* 10 ALR3d at §§ 2, 4.

In the case which was before us, there was no recorded evidence of a trade custom for the compounding of interest or for the conversion of interest into principal at designated intervals, nor were there express contractual provisions calling for installments of interest payable at stated intervals. Therefore, we need not determine whether interest may be compounded as damages under such circumstances.[2] *See Niles* v. *The Bd. of Comm'rs of the Sinking Fund* (1846), 8 Blackford 158; *The City of Aurora* v. *West* (1864), 22 Ind. 503, 522. In the absence of these elements, however, an award of pre-judgment interest on damages which are already measured in terms of simple interest must be disallowed.

We now therefore hold that interest may not be compounded by computing interest upon an amount awarded as damages in the form of interest for delayed payment of a debt.

2. We note also that the contracts here considered did not come within the statutory provisions for consumer credit sales, IC 24-4.5-2-202 (Burns Code Ed. 1971), or consumer loans, IC 24-4.5-3-202 (Burns Code Ed. 1971).

. Our opinion of December 30, 1976 is modified in conformity herewith.

Buchanan, P.J. and White, J., concur.

NOTE.—Reported at 360 N.E.2d 610.