**COURTESY ENTERPRISES, INC., d/b/a CEI Truck and Ag Equipment, Defendant-Appellant,**

v.

**RICHARDS LABORATORIES, Plaintiff-Appellee.**

**No. 3-982A236.**

Court of Appeals of Indiana, Third District.

Dec. 15, 1983.

James R. Heuer, Gates & Gates, Columbia City, for defendant-appellant.

Michael D. Rush, Rush & Hufford, Columbia City, for plaintiff-appellee.

GARRARD, Judge.

Courtesy Enterprises, Inc. (Courtesy) appeals the trial court's decision for Richards Laboratories (Richards) on Richards' complaint on an account and on Courtesy's counterclaim for breach of warranty.

Richards manufactures "Floater Foam," which is used to mark the path along which chemicals have been applied to farm fields. Courtesy bought Floater Foam from Richards and sold it to farm cooperatives, which used it in their application of agricultural chemicals. Courtesy had been buying Floater Foam since 1978. In 1979 Courtesy notified Richards that the foam "jelled," or settled, in storage. Courtesy's customers were complaining because the jelled foam was unusable. Because Courtesy felt itself bound to honor a guarantee contained in a sales brochure supplied by Richards, it compensated the unhappy customers with replacement foam or with account credits. Richards, in turn, credited Courtesy's account for foam returned to Richards by Courtesy. Richards also devised a remedy for the problem: if jelled foam were heated and agitated, it returned to its original, usable state.

Because Courtesy found its customers unwilling to expend the effort required to revive jelled foam, it continued to accept returns, accumulating 2500 gallons of foam by 1980. Despite this accumulation, Cour-

tesy ordered 1000 gallons of "new" foam from Richards on April 11, 1980. Richards sent the foam, and a bill for $5,140.00, but the bill was not paid. On July 2, 1980 Courtesy informed Richards that it wanted to return a quantity of foam, usable and unusable, for account credit. The return was to include the remnants of the April 11 shipment plus foam accumulated from customer returns. Richards agreed to the return on the condition that Courtesy submit, in advance, an inventory of exactly what would be returned.

On August 8, 1980 Richards received a shipment of foam from Courtesy, unannounced. Of the 1003 gallons which Courtesy apparently shipped,[1] Richards received 643 gallons in varying states of preservation. Richards issued a credit to Courtesy's account for the value of the shipment, and demanded payment of the balance due it. This demand was renewed without success until finally, on February 17, 1981, Richards filed a complaint against Courtesy for the amount due. Courtesy responded with a counterclaim alleging breach of implied and express warranties and asking damages for foam replaced, shipping costs and customer dissatisfaction. The cause was tried to the court and resulted in a general judgment in favor of Richards, on both the complaint and the counterclaim.

Courtesy raises three issues on appeal:

1. Did the trial court improperly grant the plaintiff's complaint on account:

2. Did it improperly grant pre-judgment interest on that account?

3. Did the trial court's denial of Courtesy's counterclaim ignore express and implied warranties made on Floater Foam by Richards?

 In assessing Courtesy's arguments, we will not weigh the evidence. We will consider only whether the evidence favorable to the judgment was sufficient to support the decision.

### I.

 Courtesy argues that the trial court should have denied Richards' complaint because the August 1980 shipment of foam to Richards revoked Courtesy's acceptance of the April 11, 1980 shipment and "cancel[led] out the amount claimed in Richards' Complaint." This argument fails because Courtesy's actions in regard to the August 1980 shipment failed to comply with the statutory requirements for a valid revocation of acceptance. The applicable statute is IC 26–1–2–608, which provides:

"(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

(b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them."

The first requirement for a revocation of acceptance under IC 26–1–2–608 is that the goods in question be "non-conforming." Because that requirement was not met in this case, Courtesy's first argument fails.

"Conforming" goods are goods consistent with the seller's obligations under its agreement with the buyer. IC 26–1–2–106(2). In determining whether goods are conforming, previous dealings between the parties are relevant. IC 26–1–1–205(1) and

---

**1.** The remainder of the 2500 gallon accumulation leaked from its containers in storage and was lost to both parties.

(3). Courtesy presented no evidence at trial that the foam in the April 11, 1980 shipment diverged in any significant degree from previous shipments of foam which Courtesy had accepted, and paid for. The only criticism Courtesy leveled against the foam in the April 11 shipment, or against Floater Foam in general, was its tendency to settle; but this was not a criticism unique to the April 11 shipment. All the foam which Courtesy had purchased from Richards had that tendency. Courtesy knew of that tendency in 1979. Courtesy knew of that tendency when it ordered the April 1980 shipment and when it accepted it. Because it knew of the foam's predilection for settling when it ordered and accepted the April 1980 shipment, and because the identical predilection was present in all the prior shipments ordered and accepted by Courtesy, there was no non-conformity in the April 11, 1980 shipment upon which to premise a revocation of acceptance under IC 26–1–2–608. Even if one were to assume that the tendency to jell represented the required non-conformity, Courtesy's acceptance of the shipment with knowledge of that tendency precluded its revocation of acceptance. IC 26–1–2–607(2).

■ Because Courtesy's argument founders upon the fundamental requirement of non-conformity, it is not necessary to discuss at length additional defects in Courtesy's attempt to execute that revocation. We feel constrained to point out, however, that Courtesy's return of foam from the April 11 shipment in company with returned foam from earlier shipments was not a revocation of acceptance of the "lot or commercial unit" accepted in April 1980, that the return in August 1980 was not made with a "reasonable time" as is required by the statute, and that Courtesy failed to provide Richards with notice of the revocation, as is also required. For all these reasons, Courtesy's first argument fails.

## II.

Courtesy's second argument is that the trial court erroneously denied its counterclaim for damages resulting from Richards' breach of express and implied warranties on Floater Foam. Courtesy's counterclaim embraced all the foam it purchased from Richards from 1978 through 1980.

■ Assertion of breach of warranties is governed by IC 26–1–2–607(3)(a), which provides:

"(3) Where a tender has been accepted ... the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."

A "reasonable time" for notice by a merchant buyer is determined by "applying commercial standards." UCC Section 2–607, comment 4. A "merchant" is one who "deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the ... goods involved." IC 26–1–2–104(1). Courtesy is held to the merchant buyer standard of IC 26–1–2–607(3)(a). Courtesy was in the business of selling agricultural equipment, including machinery for applying liquid fertilizer. Courtesy dealt in Floater Foam as an adjunct to that business. Therefore, Courtesy qualified as a "merchant" dealing in fertilizer foam under the first condition of IC 26–1–2–104(1). In addition, Courtesy's primary business occupation made it inevitable that Courtesy represented itself as possessing peculiar knowledge of fertilizer and fertilizer foam.[2]

■ Before we can determine whether Courtesy provided the notice required by "commercial standards," we must consider the policies responsible for the notice requirement. Commercial policies are a fundamental consideration in applying our statute. IC 26–1–1–102(1). The Uniform Commercial Code requires notice of breach of warranties "to defeat commercial bad

**2.** Courtesy is also held to the merchant standard because IC 26–1–2–607(3)(a) only provides for two standards, merchant and consumer. What-ever Courtesy's capacities in this area, they are not so minimal as to qualify it as a "retail consumer" of Floater Foam.

faith." UCC Section 2–607, comment 4. Commercial bad faith is the antithesis of commercial good faith, which is "honesty in fact and observance of reasonable commercial standards of fair dealing." IC 26–1–2–103(1)(b). The essence of good faith among merchants is the observance of commercial standards of fair dealing. Merchants are held to an " 'objective' standard ... measured by what a reasonable person in the trade ought to have done." 67 *Am.Jur.2d* "Sales" Section 16. Whether a buyer gave notice of an asserted breach of warranty as "a reasonable person ... ought to have done" depends upon the timeliness of the notice and upon its content. 67 *Am.Jur.2d* "Sales" Section 728.[3] We now consider whether the evidence established that Courtesy gave good faith notice of its intention to assert breach of warranties on Floater Foam.

▮ IC 26–1–2–607(3)(a) explicitly requires notice within "a reasonable time." What is a reasonable time depends upon the particular circumstances. IC 26–1–1–204(2). One such circumstance is the existence of a course of dealing between the buyer and seller. A course of dealing is a sequence of previous conduct which establishes a basis for interpreting the actions of the two parties. IC 26–1–1–205(1) and (3). In determining whether a disgruntled buyer gave timely notice of an alleged breach of warranties, one must examine previous dealings between that buyer and that seller. Such dealings provide an interpretative context for the buyer's actions. In addition to factual circumstances such as a course of dealing between the parties, there are specific policy considerations which determine the timeliness of notice. These policy considerations derive from the commercial goals which notice of breach is intended to promote. The first, and most important, of these is that notice must be given so as to enable the seller to settle the issue through negotiation or other non-litigious means. *J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code* 421 (1980); UCC Section 2–607, Com-

ment 4. A second consideration is that notice should be provided to allow the seller to prepare for negotiation, and litigation. *White & Summers* at 422. The final policy consideration involved is that notice is required to discourage the assertion of stale claims in the same way .as, and for the same reasons as, do statutes of limitation.

▮ What runs throughout all these considerations is the seller's right to rely upon the finality of a transaction after the elapse of a particular period of time. The buyer is not barred from asserting a breach if he does so before the seller may reasonably expect that the transaction has ceased to be problematic. UCC Section 2–607, Comment 4. The premise is balancing fairness to the buyer, who may encounter defective merchandise, with fairness to the seller, who is entitled to rely upon the conclusiveness of a sale at some point. This is the essence of the good faith requirement of IC 26–1–2–607(3)(a). In determining whether the requirement has been met, the facts of the particular case are especially important. One fact of significance is whether the buyer knew of the alleged defect within a short time of his acceptance of the merchandise. This fact goes to the reasonableness of the buyer's actions: If he did know within such a period, and notified the seller with some expedition of his dissatisfaction, he would be acting as a reasonable merchant ought to act. If, however, the buyer knew of the existence of alleged defects within a reasonable period of time and did not notify the seller of his dissatisfaction for some time after that, his actions would not be those of a reasonable merchant concerned with saving the transaction and with avoiding litigation.

▮ Based on these considerations, the trial court could reasonably have determined that Courtesy did not satisfy the good faith requirement of reasonable notice under IC 26–1–2–607(3)(a). There was, first of all, a course of dealing extant between Courtesy and Richards. Courtesy

**3.** *See also White & Summers, Uniform Commercial Code* (2d Ed.) Section 11–10.

had purchased, and paid for, seven shipments of Floater Foam in 1978 and 1979. These purchases established a basis of understanding, a context within which the acts of Courtesy and of Richards would be understood. From these prior dealings, Richards had developed the legitimate expectation that Courtesy would pay for the Floater Foam it ordered, and that Courtesy was satisfied with the product. Such a course of dealing affects the seller's legitimate expectations of transactional finality. Here, Richards had a heightened expectation of finality, and of reliance upon that finality, because of the sequence of past dealing. Such a sequence, at the very least, reduces the seller's concern that the sale will prove troublesome. It was incumbent upon Courtesy, in the face of this expectation, to notify Richards that previous dealings had ceased to govern, and that Courtesy was significantly dissatisfied with its acquisitions of Floater Foam. Courtesy did not do this. Courtesy's only step in this direction was inaction. It neglected to pay for the last shipment of foam. This inaction was not such an act of commercial good faith as is required under IC 26–1–2–607(3)(a) because it did not alert Richards to the fact that the transaction was "troublesome." UCC Section 2–607, Comment 4.

This inaction also effectively precluded Richards' employment of any non-litigious remedy. Had Courtesy contacted Richards and explained its intention to assert a breach of warranty claim because of its increasing dissatisfaction with Floater Foam, it is possible that a settlement could have been effected. Courtesy admitted that Richards had been "good" about accepting returned foam. Such notice not only might have avoided litigation, it would certainly have resulted in less of the stockpiled foam having been lost from leakage and jelling. Courtesy does not assert that it could not have given notice of its intention. There is no indication that, as discussed above, Courtesy was unaware of the defect which was to form the basis of its claim of breach within a short period after receiving, at least, the April shipment. There is no indication that Courtesy learned anything about Floater Foam, or about itself, which made assertion of the claim impossible until Courtesy filed its counterclaim. Courtesy's capacity for providing notice of its intention to assert breach had "ripened" at least by the time of the August return shipment. Yet there was no notice of that intention until the counterclaim, eleven months later.

An analogous situation occurred in *Pace v. Sagebrush Sales Co.* (1977), 114 Ariz. 271, 560 P.2d 789. In *Pace* a lumber dealer ordered and accepted a shipment of lumber from his supplier in March. The bill for the shipment was still unpaid when the supplier filed suit in July of the same year. The dealer counterclaimed for breach of warranty three weeks later. The Arizona Supreme Court affirmed the summary judgment entered for the supplier by the trial court, employing the following analysis:

> "The requisite notice was finally given over four months following receipt of the lumber. Considering that Pace is a merchant held to a higher standard of dealing than consumers; that lumber is of a semi-perishable nature when left outside, as it was here; that Pace had the goods in his yard for sale with ample opportunity to inspect; and that he should have discovered any defects soon after acceptance of the goods, we think it manifest that as a matter of law, notification four months after acceptance is not a reasonable time within which to notify a seller of defects in goods sold."

560 P.2d at 792.

We find the *Pace* analysis applicable here. Like Pace, Courtesy had ample opportunity to inspect the goods. Unlike Pace, Courtesy admitted that it was aware of the defects which form the basis of its claim of breach of warranties when it ordered the unpaid-for shipment. To permit an assertion of breach for goods ordered with full knowledge of their infirmities is to push reasonableness to unreasonableness. *Pace* employs the aforementioned analysis concerning the buyer's knowledge of the defects which give rise to the war-

ranty claim. Here, not only did Courtesy's knowledge exist within a short period after acceptance of, at least, the final shipment of foam, but it existed before that shipment was ordered. Leaving aside the substantive question of whether one should be allowed to assert a breach of warranty upon goods ordered with full knowledge of their condition, this fact at least imposed upon Courtesy an obligation to notify Richards of its intent with all practical speed. This obligation was all the more urgent in light of the parties' previous, apparently unproblematic, dealings. Yet Courtesy's notice to Richards was in its counterclaim, filed eleven months after Courtesy's return of Floater Foam to Richards. This was not a reasonable time for one with knowledge of the condition of the goods. It was unreasonable even for the April 11, 1980 shipment. When one considers that Courtesy's assertion of breach of warranty encompasses shipments extending back to 1978, the unreasonableness is exacerbated to an extent which we need not consider here.

■■■ Courtesy's actions were insufficient to notify Richards that the transaction(s) between the two were still troublesome, and not final. They were also insufficient under the other policy considerations behind requiring notice. Courtesy's actions in asserting breach in its counterclaim minimized Richards' opportunity to prepare for litigation, and obviated any other alternative. Nor were Courtesy's actions consistent with the policy of transactional repose. Courtesy's failure to notify Richards of its intention to assert breach of warranties led Richards to assume a finality in the transaction that was not there. This assumption was reinforced by Courtesy's continuing to order Richards' product. Ordering additional goods without indicating dissatisfaction with the product is unreasonable conduct for one seeking to assert a breach of warranties of quality on that product. *G. & D. Poultry Farms, Inc. v. Long Island Butter & Egg Co.* (1969), 33 A.D.2d 685, 306 N.Y.S.2d 243. It achieves precisely the opposite of the result sought by IC 26–1–2–607(3)(a). Rather than putting the seller on notice that there is a problem with the sale, and opening up avenues for resolving that problem, it lulls him into the false belief that it has been successfully consummated. For all the foregoing reasons, we find that Courtesy did not give Richards timely notice of its assertion of breach of warranties as is required by IC 26–1–2–607(3)(a).[4]

■■■ Notice of breach of warranties is a substantive condition precedent to recovery for an asserted breach. *Thompson Farms, Inc. v. Corno Feed Products* (1977), 173 Ind.App. 682, 366 N.E.2d 3, 17; *Wagner Construction Co., Inc. v. Noonan* (1980), Ind.App., 403 N.E.2d 1144, 1149. Courtesy failed to provide notice. That failure waived Courtesy's right to assert breach under the statute. The trial court was correct in finding for Richards on this issue.

### III.

Having found that the trial court did not err in granting Richards' complaint or in denying Courtesy's counterclaim, we consider the propriety of the court's award of pre-judgment interest upon Richards' claim. The court awarded Richards the $3,087.55 it had asked for in its complaint plus $1,061.91 in pre-judgment interest. Courtesy argues that the award of interest was erroneous because it was an award upon an unascertained sum and because it represented interest computed at an excessive rate.

■■■ Under Indiana law, interest may be allowed as damages when money is

---

4. Because Courtesy's notice was unreasonably late, we do not address the sufficiency of its content. Assuredly, Courtesy's counterclaim was substantively sufficient. However, it was too late to be effective. None of Courtesy's earlier communications regarding jelling or overstocking were sufficient. "It is not enough that the seller be given notice of the mere facts constituting a nonconforming tender; he must also be informed that the buyer considers him to be in breach of the contract." *Southern Illinois Stone Co. v. Universal Engineering* (8th Cir. 1979), 592 F.2d 446; *R. Anderson, Uniform Commercial Code* Section 2–607:13 (1971).

withheld after payment is due on an account. *Rogers v. West* (1857), 9 Ind. 400; IC 24–4.6–1–103(b). The crucial factor in determining whether damages in the form of pre-judgment interest are allowable is whether the damages were ascertainable in accordance with fixed rules of evidence and accepted standards of valuation. *Indiana Industries, Inc. v. Wedge Products, Inc.* (1982), Ind.App., 430 N.E.2d 419, 427; *Blue Valley Turf Farms v. Real Estate Market* (1981), Ind.App., 424 N.E.2d 1088, 1091. If the claim is based upon a contract, and the terms of that contract make the claim ascertainable, and the amount of that claim rests upon "mere computation," pre-judgment interest is allowable. *Indiana Telephone Corporation v. Indiana Bell Telephone Co., Inc.* (1976), 171 Ind.App. 616, 358 N.E.2d 218, *modified on other grounds* 360 N.E.2d 610.

■ Richards' claim was based upon the amount outstanding on the April 11, 1980 shipment. The original amount due was $5,140.00; after Richards issued Courtesy credit for the 643 gallons of foam it received from Courtesy in August 1980, the balance, including principal and finance charges, was $3,087.55. Courtesy's argument as to the impermissibility of the interest award rests upon its contention that the amount due as credit for the returned foam was "in dispute." Courtesy's argument is based upon a misunderstanding of the applicable standard for awarding pre-judgment interest. "The test is not whether the parties have mutually fixed the amount in dispute; rather, the question is whether the principal amount is ascertainable by mere computation." *Southern School Buildings, Inc. v. Loew Electric, Inc.* (1980), Ind.App., 407 N.E.2d 240, 250.

The amount was ascertainable in the present case; Courtesy presented no evidence that it was not. Courtesy admitted that the foam in the August 1980 shipment included "bad foam;" indeed, ridding itself of this "bad foam" was the major motive Courtesy had for the shipment. In addition Courtesy did not contest the fact that foam was lost from leakage while the shipment was in transit. Given that Courtesy did not contend that the August shipment was

of unblemished character, it conceded, at least by implication, that its value was subject to ascertainment. Richards presented evidence of the means by which it arrived at its valuation of the shipment, the basis for the credit it issued to Courtesy's account. (Plaintiff's Exhibits 2, 3, 4). Because the evidence presented at trial was sufficient to permit ascertainment of the sum due to Richards with certainty, the trial court was not incorrect in awarding pre-judgment interest to Richards. 358 N.E.2d at 230.

■ Courtesy's final argument is that the award of interest was excessive. However, Courtesy fails to cite any authority for this proposition in its brief. Therefore, under Indiana Rules of Procedure, Appellate Rule 8.3(A)(7), the argument is waived. *Coghill v. Badger* (1981), Ind.App., 418 N.E.2d 1201.

The judgment of the trial court is affirmed.

HOFFMAN, P.J., and STATON, J., concur.