**CITY OF TELL CITY, Indiana, Petitioner–Appellant,**

v.

**INDIANA UTILITY REGULATORY COMMISSION, Indiana Consumer Counsel of the State of Indiana, Appellees,**

**and**

**Town of Troy, Indiana, Intervenor–Appellee.**

**No. 93A02–8908–EX–417.**

Court of Appeals of Indiana, Third District.

Aug. 20, 1990.

James A. McEntarfer, Zoercher, Huber & McEntarfer, Tell City, for petitioner-appellant.

Michael H. Hagedorn, Hagedorn Law Offices, Tell City, for intervenor-appellee Town of Troy, Indiana.

HOFFMAN, Presiding Judge.

Petitioner-appellant City of Tell City, Indiana appeals the denial of its petition for issuance of bonds by the Indiana Utility Regulatory Commission.

The facts relevant to this appeal reveal that on January 3, 1989, Tell City filed with the Commission its petition requesting ap-

proval of a new schedule of rates and charges for services rendered by its municipal electric utility[1] and authority to issue bonds to pay for the cost of improvements to its electric facility. The requested bond issuance was in the total amount of $1,450,000.00.

Tell City, through its municipal electric utility, also provides wholesale electric service to the Town of Troy. Tell City purchases its electrical power at wholesale from Southern Indiana Gas and Electric Company. The purpose of the requested bond issuance was to obtain funds to build a substation necessary to provide wholesale power to Troy when Stewart Warner–Southwind Corporation moves into Troy's service area as a new retail customer. The portion of the bond issue required to construct the substation was approximately $390,000.00

On June 29, 1989, the Commission issued its order denying Tell City's petition. The Commission found that a new substation is necessary to properly serve Stewart Warner. However, the new substation is to be built in Troy's service area. Therefore, Tell City must have Troy's permission to supply this new service. To date, Troy has not entered into a contract for the purchase of power at wholesale from Tell City to provide retail service to the Stewart Warner plant. In fact, the Commission found that Tell City had been negotiating with Stewart Warner for at least two months before notifying Troy of the negotiations. If the new substation were built and Troy refused to purchase power at wholesale from Tell City through the substation, then Tell City could incur costs of between $50,000.00 and $100,000.00 in dismantling the substation. Evidence was presented that Troy could possibly purchase power directly from SIGECO, as done by Tell City, or enter into a joint ownership with Tell City of the substation whereby Troy would own the low voltage side of the substation as alternatives to purchasing power at wholesale from Tell City. The Commission concluded that it would not be in the public

interest to issue bonds for a substation that might later have to be dismantled. Therefore without a contract between Troy and Tell City to provide retail service to Stewart Warner, Tell City's petition was denied. The Commission affirmed its decision on July 28, 1989.

Appellant's issues can be summarized as follows:

(1) whether the Commission erred in denying Tell City's petition;

(2) whether the Commission erred in admitting Alfred Snyder's prefiled testimony and certain exhibits; and

(3) whether the Commission erred in admitting the testimony of Jack Gaines and Robert Dew.

Tell City is a municipal utility within the meaning of the Public Service Commission Act of 1913, IND.CODE § 8-1-2-1 *et seq.* (1988 Ed.). As such, Tell City is required to have approval of the Indiana Utility Regulatory Commission for a bond issuance. IND.CODE § 8-1.5-2-19(a) (1988 Ed.).

■■■ This Court has jurisdiction pursuant to IND.CODE § 8-1-3-1 (1988 Ed.) which permits a public utility adversely affected by a final order of the Indiana Utility Regulatory Commission to appeal that order. There is a two-tier standard of review of the Commission's determination: first, the Commission's determination must contain specific findings of fact on all determinations material to its order and second, there must be substantial evidence in light of the whole record to support the Commission's findings of basic fact. *Habig Trucking v. Public Service Com'n* (1984), Ind.App., 466 N.E.2d 484. However this Court will not reweigh the evidence or substitute its judgment for that of the Commission when reviewing the sufficiency of the evidence. *Id.* If a reasonably sound basis of evidentiary support exists, the Commission's findings will be upheld. *Board of Dir. for Util. v. Office of Utility* (1985), Ind.App., 473 N.E.2d 1043.

■■■ Appellant argues that the Commission's findings of fact do not support its

1. On January 31, 1989, Tell City notified the Commission that it was withdrawing its request for approval of a new schedule of rates and charges for services.

ultimate determination. The following are the Commission's finding of fact:

"(b) *Petitioner's Evidence.* Petitioner presented the testimony of Mr. Frederic M. Weyer, an employee of Wayne E. Seufert and Associates, Inc., an architectural engineering firm retained by Stewart–Warner–Southwind Corporation, concerning the relocation of their Indianapolis plant to the Tell City Industrial Park. Mr. Weyer testified that he had assumed Petitioner would be providing service to Stewart–Warner. He stated that he did not contact Intervenor [Troy] or its Utility Service Board until after the project was bid in December, 1988. He testified further that he never communicated with Intervenor with respect to the total electricity requirements of the Stewart–Warner plant because he was under the impression that Mr. Joyce, Petitioner's Superintendent, would be handling the project.

Mr. Wilbur W. Sterling, Manager of Manufacturing for Stewart–Warner, testified on behalf of Petitioner that occupancy of the new Stewart–Warner plant was scheduled for May 1, 1989, and that their new plant building was substantially completed. He testified that he did not recall how the estimates of Stewart–Warner's power cost were calculated but that he did not consider Intervenor's rates because all dealings were with Petitioner. On cross-examination by the Public, Mr. Sterling expressed his concern that a dispute between Petitioner and Intervenor might be costly and time-consuming.

Mr. James R. Schmitt, Chairman of Petitioner's Utility Service Board, testified on behalf of Petitioner that Petitioner and Intervenor have not entered into a contract, the terms and conditions of which would affect the financing proposed in this Cause.

Finally, Mr. Jack M. Joyce, Petitioner's Superintendent, testified on behalf of Petitioner that he had known in September, 1988 that the proposed Stewart–Warner plant was to be located in Intervenor's service area. He testified further that his notes had indicated that Intervenor would have to experience a substantial voltage drop in order to accommodate the Stewart–Warner plant; however, the witness did not communicate this information to Intervenor. In addition, Mr. Joyce stated that work on plans for the new substation began in October, 1988. He stated that Petitioner submitted a contract for wholesale power to Intervenor on January 10, 1989, but that Intervenor had not yet executed any contract. He testified that there had been meetings between Intervenor and Petitioner. He suggested that if Intervenor does not enter into a wholesale power contract with Petitioner and unless this Commission orders otherwise, Petitioner will build the proposed substation in Intervenor's territory. He testified that later Petitioner might dismantle the substation or sell it to Intervenor. Mr. Joyce also stated that without a contract with Intervenor, Petitioner would be prohibited by law from providing retail power to Stewart–Warner. He added that Petitioner is going forward with plans for the substation notwithstanding the lack of a contract with Intervenor, but he admitted that without a contract, it would not be necessary to finance the substation or to build it. Mr. Joyce testified on cross-examination by the Public that Petitioner first became aware of Stewart–Warner's interest in locating in the Tell City Industrial Park six months before Intervenor was notified. He stated that in retrospect, including Intervenor [sic] might have made the negotiations more amenable to Intervenor but that the negotiations were 'more or less secret in nature at the request of Stewart–Warner.' Mr. Joyce felt strongly that Petitioner had given Intervenor full disclosure at its first meeting with Petitioner on October 13, 1988. Mr. Joyce concluded that Petitioner would 'do everything the same way in the future' and that Petitioner 'feels confident that it did nothing wrong.'

Petitioner's fourth witness was Michael C. Jenner, of Alpha Engineering of Indiana, Inc. Mr. Jenner testified on

cross-examination that if Intervenor does not purchase power at wholesale from Petitioner through the proposed substation then it would be unnecessary to finance or build the substation. He testified that the cost of dismantling the substation and moving it would be between $50,000 and $100,000. He suggested that the best solution to the substation problem would be an agreement between the two municipalities, Petitioner and Intervenor.

(c) *Intervenor's Evidence.* According to Intervenor's Exhibit No. 4, the first written communication between Petitioner and Intervenor with respect to Stewart–Warner's decision to locate within Intervenor's service territory occurred on October 4, 1988, approximately two months after Petitioner learned of the decision. In addition, Intervenor presented as Exhibit No. 8 a copy of an unexecuted wholesale power contract and a copy of the minutes of a meeting between Intervenor's Utility Service Board and Petitioner's Electric Department Negotiating Committee, held on January 10, 1989. Intervenor's principal witness was Mr. Jack D. Gaines, Assistant Vice President and Manager of the Retail Rates Department for Southern Engineering Company. On direct examination, Mr. Gaines testified that if Intervenor does not purchase power at wholesale from Petitioner, Intervenor could purchase power directly from SIGECO. Mr. Gaines agreed, however, that a substation is necessary to provide reliable service to Stewart–Warner in the long run. Mr. Gaines proposed, on behalf of Intervenor, a joint ownership of the substation which would be accomplished according to the following plan: Ownership by Intervenor of the low voltage side of the substation (to be constructed by Petitioner); reduction in the amount of Petitioner's bond issue by $256,128, which is the difference between Petitioner's original estimated cost of the entire substation and the cost of the high voltage side of the substation; and a corresponding reduction in the Petitioner's rate to the Intervenor in the amount of $22,240. In

the event that Intervenor and Petitioner cannot negotiate a wholesale power contract which provides for Intervenor's ownership of the low voltage side of the substation, Intervenor proposed a reduction in the amount of Petitioner's bond issue by $107,000, which represents the difference between the Petitioner's original estimate of the cost of the metalclad switchgear and the actual highest bid received to date by Petitioner (Petitioner originally estimated the metalclad switchgear at a cost of $250,000). In addition, if joint ownership cannot be agreed upon, Intervenor proposed a corresponding reduction in Petitioner's rate to Intervenor in the amount of $12,107.

Mr. Gaines testified that low-side ownership would allow Intervenor greater flexibility to change power suppliers in the future. With respect to how Intervenor would finance low-side ownership, Mr. Gaines suggested that short-term financing could probably be obtained in a timely fashion to cover costs not covered by Intervenor's general funds.

On behalf of Intervenor, Mr. Robert C. Dew, Jr., Vice President of Southern Engineering Company, testified that he supports Mr. Gaines' recommendation that Intervenor should not endeavor to own and operate a high voltage substation facility at this time. He testified further that he supports Mr. Gaines' recommendation that Intervenor purchase the low voltage portion of proposed substation for the reasons already stated in Mr. Gaines' testimony.

(c) [sic] *The Public's Evidence.* The Public offered the testimony of Mr. Neal Mr. Krevda, Technical Analysis Coordinator and Accounting Supervisor to the Office of the Utility Consumer Counselor. Mr. Krevda's prefiled direct testimony was concerned mostly with the impact that the proposed substation would have upon Petitioner's revenue requirement. However, on redirect examination, Mr. Krevda stated that in his opinion both Petitioner and Intervenor would be 'winners' if there were a contract between them which allowed Intervenor to have

the ability to operate the low voltage side of the substation and allow Petitioner the opportunity to operate the high voltage side. He suggested that the cost of power could be renegotiated under that scenario. With respect to the substation issue, Mr. Krevda also testified that the Public had not discussed a settlement offer with the other parties.

(d) [sic] *Commission Staff Reports.* The reports prepared in this Cause by the Commission Engineering and Accounting Division were marked as Staff Exhibits No. 1 and No. 2 respectively and admitted to the record pursuant to I.C. 8-1-1-5. The preparers of those exhibits were then tendered for cross-examination. Mr. Terry Myers of the Commission Accounting Division testified on cross-examination that if it were feasible for municipalities to share a facility, then he believed it would be reasonable to do so, so long as all books and records were accurately kept. Mr. Myers testified further that if such a sharing of facilities were not feasible, then financing as proposed by Petitioner in this Cause should be approved. Mrs. Wendy Weathers of the Commission Engineering Division declined to comment on Intervenor's proposed joint ownership of the substation because she did not have enough time to evaluate the proposal."

Not only are these findings specific on all determinations material to the Commission's order but there is substantial evidence in light of the whole record to support the Commission's findings. These findings overwhelmingly support the conclusion of the Commission that a substation is not reasonably necessary without a contract between Troy and Tell City. It cannot possibly be in the public interest to run a risk of dismantling the substation at a cost of between $50,000.00 and $100,000.00. The Commission's decision is not contrary to law.

The appellant further complains that the Commission failed to follow its own standard in making its determination. The Commission applied the following standard: "First the Commission must consider whether the proposed capital improvement program is reasonably necessary to enable the petitioner to render adequate and efficient utility service. Second, the Commission must determine whether the proposed bond issue is a reasonable method for financing the necessary capital improvements."

The Commission did not have to reach the second step of its standard. Although a new substation is necessary in order to properly serve Stewart Warner, it is not reasonably necessary to enable Tell City to render adequate and efficient utility service unless and until Troy agrees to execute the contract for the purchase of power at wholesale from Tell City and to provide retail service to the Stewart Warner plant.

■ Appellant next argues that much of the evidence presented by Troy through the prefiled testimony of Alfred Snyder was not relevant and thus, should not have been admitted. However upon reviewing the specific questions and answers designated by appellant as irrelevant, this Court finds that other evidence of the same character and same effect was admitted at the hearing, without objection, particularly during the cross-examination of Jack Joyce. Therefore any error in the admission of portions of Snyder's prefiled testimony was harmless. *See: Moss v. State* (1975), 165 Ind.App. 502, 333 N.E.2d 141, *reh. denied* 165 Ind.App. 502, 335 N.E.2d 633.

■ Appellant also alleges that Exhibits AES-1, AES-7, AES-10, and AES-12 should not have been admitted on the basis of relevancy. As to Exhibit AES-1, once again, this Court finds that the content of the evidence was admitted without objection during the cross-examination of Joyce. *Moss, supra.* Exhibit AES-7 was objected to on the basis that it revealed settlement negotiations. Although there was no evidence of settlement negotiations in Exhibit AES-7, this issue is waived since appellant now objects to the admission of the exhibit on a different basis than at the hearing. The grounds for objection on appeal to admission of evidence must be the same as the grounds asserted at trial. *Clouse v. Fielder* (1982), Ind.App., 431 N.E.2d 148.

Exhibits AES–10 and AES–12 were admitted without objection at the hearing. Failure to raise a specific objection and argument at trial waives the issue for appeal. *Bedgood v. State* (1985), Ind.App., 477 N.E.2d 869. Therefore the objections to Exhibits AES–10 and AES–12 are also waived.

■ Appellant claims there was an insufficient foundation to establish the requisite expertise of Troy's witness, Jack Gaines. In order for a witness to qualify as an expert, two requirements must be met:

> " 'First, the subject-matter of the expert's opinion must be so distinctly related to some science, profession, business or occupation as to be beyond the knowledge of the average layperson. Secondly, the witness must have sufficient skill, knowledge or experience in the field to make it appear that the witness' opinion or inference will probably aid the trier of fact in the search for truth. [Citations omitted.]' "

*Boothe v. State* (1982), Ind.App., 439 N.E.2d 708, 713. It is this second requirement that appellant argues was not fulfilled.

■ Jack Gaines testified that he is assistant vice president and manager of the retail rates department of Southern Engineering Company, an engineering consulting firm. He graduated from the Georgia Institute of Technology where he received a Bachelor of Science in Industrial Management and has been employed by Southern Engineering for the past 12 years as a rate consultant. Gaines has testified and submitted exhibits in many rate cases in the past, including cases before the Indiana Utility Regulatory Commission, the Kentucky Public Service Commission, the Vermont Public Service Board, the Virginia State Corporation Commission, the Georgia Public Service Commission, the Illinois Commerce Commission, the New York Public Service Commission, and the Federal Energy Regulatory Commission. In 13 different states he has also prepared or assisted in the preparation of rate and cost of service studies for either rural cooperatives or municipal utility systems.

Troy asked Gaines to provide an independent review of the petition for issuance of bonds and for approval of a new schedule of electric rates and charges filed by the City of Tell City, Indiana. Based upon his review, he was to render an opinion as to whether Tell City's proposal to construct a new 69 kV substation in the Troy approved service territory was necessary and proper. Second, he was to ascertain whether the estimated cost of the proposed substation was reasonable, and what portion of that cost should be borne by Troy through the rate it pays Tell City for wholesale for resale electric service. Third, he was to determine if Tell City's revenue derived through its rate for service to Troy appropriately recovers Tell City's cost of providing electric service to Troy. In forming his independent review, he consulted with Robert Dew, a registered professional engineer in the State of Indiana, who works at Southern Engineering Company. Gaines testified that it is customary, usual, and in the normal course of practice in his profession to consult with engineers at the Southern Engineering Company. In fact, whenever he testifies as a rate consultant, he consults with the engineers in formulating his testimony. Gaines was properly qualified to testify as an expert.

■ Appellant complains in part because of Gaines' reliance on Dew's information. The Court has said the following on hearsay information:

> " 'The opinion of an expert is not necessarily rendered inadmissible or incompetent because it may be based on knowledge of facts gained from hearsay sources. Any expert worthy of the name must of necessity assimilate prior learning derived from the experiences of others. As an expert witness he draws upon various sources of information whose credibility or trustworthiness he must determine in light of his expertness. It would completely frustrate the use of expert witnesses if they were obliged to substantiate each single factor upon which their ultimate opinion must depend upon first hand personal knowledge or personal experience. If some of

the expert's factual information is derived from sources fairly trustworthy though hearsay and he has as such the ability to coordinate and evaluate that information with all the other facts in his possession secured through personal observation, the trial court may in the exercise of a sound discretion permit the expert's ultimate opinion to be considered by the jury.'"

*Phillips v. State* (1979), 179 Ind.App. 517, 524, 386 N.E.2d 704, 708.

Gaines testified that it is customary to discuss each particular case with an engineer. Thus his opinion based in part on his discussion with the engineer, Dew, was admissible.

Appellant also complains that the testimony of Dew and Gaines "is circular with no beginning and no end other than a series of conclusions which exist without any identifiable source of information or factual basis." This is not true. Dew, like Gaines, was properly qualified as an expert. In agreeing with Gaines' previous testimony, Dew explained that he had been hired by Troy to work with Gaines. This would explain his agreement with Gaines' testimony. However, Dew continued to explain the reasons for their conclusion at the hearing. There was no error in the admission of the testimony of these two witnesses.

Affirmed.

STATON and CHEZEM, JJ., concur.