**INDIANA BELL TELEPHONE COMPANY, INCORPORATED d/b/a Ameritech Indiana, Appellant,**

v.

**OFFICE OF UTILITY CONSUMER COUNSELOR, Appellee/Cross–Appellant,**

v.

**Indiana Utility Regulatory Commission, Smithville Telephone Company, Inc., TCG Indianapolis, Indiana Cable Telecommunications Association, Inc., AT&T Communications of Indiana, Inc., Worldcom Inc., d/b/a LDDS Worldcom, MCI Telecommunications**

Corporation, Sprint Communications Company, L.P., United Telephone Company of Indiana, United Senior Action of Indiana, Inc., Citizens Action Coalition of Indiana, Inc., American Association of Retired Persons, Inc., Shared Technologies Fairchild Telecom, Inc., LCI International, Inc., and Time Warner Communications of Indiana L.P., Appellees.

No. 93A02–9801–EX–22.

Court of Appeals of Indiana.

Oct. 14, 1999.

Sue E. Stemen, Ameritech Indiana, Teresa E. Morton, Stanley C. Fickle, Mark A. Lindsey, Barnes & Thornburg, Indianapolis, Indiana, Attorneys for Appellant.

Anne E. Becker, Timothy M. Seat, Indiana Office of Utility Consumer Counselor, Indianapolis, Indiana, Attorneys for Appellee/Cross–Appellant.

Michael A. Mullett, Mullett & Associates, Indianapolis, Indiana, Attorney for Appellees.

## OPINION

MATTINGLY, Judge

Indiana Bell Telephone Company, Inc. d/b/a Ameritech Indiana ("Ameritech") appeals the Final Order on Interim Relief entered by the Indiana Utility Regulatory Commission (the "Commission") on December 30, 1997. The Office of Utility Consumer Counsel (the "OUCC")[1] cross-appeals.[2] This case requires our interpretation of the Commission's authority and responsibility under Ind.Code § 8-1-2.6-1 *et seq.* ("the Alternative Regulation Statute"), which was enacted to promote competition in the provision of telephone services. We consolidate and restate the issues raised on appeal as follows:

1. Whether the Commission erred by adopting a new alternative ratemaking method without providing the required notice and hearing to interested parties and without finding that the alternative ratemaking method meets specific statutory requirements;

2. If the Commission erred by adopting a new alternative ratemaking method, how Ameritech's interim rates should be determined following the expiration of an earlier alternative regulation agreement;

3. Whether the Commission erred in denying the OUCC's request to make Ameritech's interim rates subject to retroactive change and possible refund upon further review; and

4. Whether the Commission's Final Order requiring Ameritech to provide certain telecommunications infrastructure investments as it agreed to do under an earlier alternative regulation agreement is contrary to law.

1. The OUCC is the state agency assigned by statute to represent the interests of Indiana utility consumers.

2. A joint reply brief was also filed by American Association of Retired Persons, Inc., Citizens Action Coalition of Indiana, Inc. and United Senior Action of Indiana, Inc.

We affirm in part and reverse and remand in part.

## FACTS AND PROCEDURAL HISTORY

In 1985, the legislature enacted Ind. Code § 8-1-2.6-1 *et seq.* In this statute, the legislature noted that competition in the provision of certain telephone services had become commonplace in Indiana and that the traditional regulatory policies and practices of the Commission were not designed to deal with such a competitive environment. The legislature authorized the Commission to:

formulate and adopt rules and policies as will permit the [C]ommission, in the exercise of its expertise, to regulate and control the provision of telephone services to the public in an increasingly competitive environment, giving due regard to the interests of consumers and the public and to the continued availability of universal telephone service.

*See* Ind.Code § 8-1-2.6-1(5).

Ameritech provides various telecommunications services to Indiana consumers and has been subject to regulation by the Commission. From June 30, 1994 through December 31, 1997, Ameritech was subject to reduced regulation by the Commission. This reduced regulation was the result of the Commission's declination of its jurisdiction over Ameritech upon approval of a negotiated settlement agreement commonly known as Opportunity Indiana. This agreement, which was approved by the Commission on June 30, 1994, established a temporary alternative regulatory structure for Ameritech as provided by Ind. Code § 8-1-2.6-1 *et seq.*[3]

Opportunity Indiana classified Ameritech's telecommunications offerings into

3. Numerous parties, including the OUCC, consumer protection organizations, and firms in competition with Ameritech, participated in the extensive negotiations which resulted in the Commission's approval of Opportunity Indiana.

three distinct categories: 1) basic telephone service, referred to as "Basic Local Service" or "BLS"; 2) discretionary services, referred to as "BLS–Related Services": and 3) competitive services, referred to as "Other Services."[4] The alternative regulation plan provided for different levels of regulatory oversight for each of the three categories of service. Opportunity Indiana instituted certain price caps for BLS and BLS–Related Services, fixing the maximum prices which Ameritech could charge for services in those categories.[5] It also allowed Ameritech to introduce new services and corresponding rules in the Other Services category. Prices in the Other Services category were not made subject to regulatory oversight, as it was assumed that competitive market forces would regulate the prices for these new service offerings.

The Opportunity Indiana settlement required Ameritech to cut its revenue by $57 million per year for the term of the agreement through a series of reductions in specified charges. Ameritech agreed to invest $20 million per year for the years 1994 through 1999 to provide digital switching and transport facilities to every interested school, hospital, and major government center in its service area on a non-discriminatory basis. Ameritech also agreed to invest $5 million per year for the years 1994 through 1999 in the Corpora-

---

4. The BLS category involves local telephone service, or "voice-grade access to the network plus usage within the traditional local calling area," including basic line charges, zone charges, and the end-user line charge. Supplemental R. at 23. The BLS–Related Services category includes "any service which enhances, supplements or depends on BLS but does not upgrade the quality of access above voice-grade or extend usage beyond the local calling area." *Id.* at 23–24. BLS–Related Services include touchtone service, directory assistance, operator-assisted calling, provision of one free telephone directory, call tracing, and billing and collection for BLS and BLS–Related Services. *Id.* The Other Services category incorporates any service other than BLS or BLS–Related Services and includes Centrex, Dedicated Communications Services, toll-free calling, and WATS service. *Id.* at 24.

5. The theory of price-cap regulation is entirely different from the theory of rate-of-return regulation under traditional regulatory statutes. In prepared testimony before the Commission, Trevor R. Roycroft, Ph.D., on behalf of intervenors American Association of Retired Persons, Citizens Action Coalition of Indiana, and United Senior Action of Indiana, provided the following explanation of the basic theory of price-cap regulation:

> If a firm's prices are capped at a maximum level and all profit constraints are removed, that firm will have a strong incentive to cut costs. The most basic price cap plan is one that sets maximum prices for services and eliminates all profit constraints on the firm. However, this form of price cap regulation does not provide a means to reflect productivity gains (cost decreases) through price reductions. Nor does this method provide a means to reflect productivity losses (cost increases) through price increases.
>
> Another type of price cap plan links the maximum allowable price (or cap) to an index. This methodology allows a regulated entity some flexibility to change its maximum prices over a period of time. Under this type of price cap plan, the maximum allowable price is periodically adjusted based on the interaction between a price (inflation) index, known as an "Input Price Index," and presumed decreases in controllable costs, known as a "Productivity Factor." One of three price indices is usually used for the Input Price Index: the Consumer Price Index, the Produce[r] Price Index, or the Gross Domestic Price Index. The Productivity Factor tracks a firm's productivity growth on an annual basis; thus, a company's historical productivity is considered in determining the productivity factor. A negative value for the price cap index indicates that a price cap reduction for the capped service is required. Conversely, a positive value for the price cap index shows the maximum allowable price increase for the service.

R. at 4150–57.

Ameritech asserts that, in the Opportunity Indiana proceeding, it originally proposed a price-cap plan linked to an index, which plan other parties rejected as being too complicated. Instead, Opportunity Indiana substituted basic price caps, which guaranteed certain price reductions, for the traditional regulation based on rates of return. Appellant's Brief at 10 n.5; R. at 4885.

tion for Educational Technology or a similar non-profit corporation to fund information processing and telecommunications equipment.

Under Opportunity Indiana, the reduced level of Commission regulation was limited to a term of three and a half years. The plan specifically provided for a "transitional regulatory framework" with a definite expiration date of December 31, 1997. The plan also provided an eight-month window between May 1, 1997 and December 31, 1997 for Ameritech to petition the Commission to establish a new alternative regulatory structure to take effect following the expiration of Opportunity Indiana. The agreement was silent as to what would happen to Ameritech's rates upon the expiration of the agreement.

On May 1, 1997, Ameritech filed a petition as provided by Ind.Code § 8–1–2.6–1 *et seq.* to establish an alternative regulatory framework to take effect following the expiration of Opportunity Indiana. Ameritech's petition also requested that, if the Commission could not enter an order on Ameritech's petition by December 31, 1997, the Commission extend the alternative structure agreed to in Opportunity Indiana pending issuance of a final order.

Thirteen entities, mostly consumer groups and competitors of Ameritech, intervened in the Commission's proceeding. The OUCC participated on behalf of the public. After the parties failed to agree on a procedural schedule which would permit the Commission to complete a permanent regulatory structure before Opportunity Indiana expired, the Commission ordered Ameritech to proceed separately on the issue of interim relief (i.e., the regulatory structure that would apply after the expiration of Opportunity Indiana and until the Commission's final order on Ameritech's petition for an alternative regulatory framework). From

that point, Ameritech's original petition for relief under the Alternative Regulation Statute was bifurcated and has proceeded on two tracks: 1) the regulatory structure to replace Opportunity Indiana, referred to as "permanent relief"; and 2) the interim regulatory structure for Ameritech during the period between December 31, 1997 and the Commission's entry of an order on permanent relief. This appeal involves the interim regulatory structure only.

During a second hearing held September 30–October 2, 1997,[6] the OUCC presented evidence that interim relief was not appropriate because Ameritech had failed to establish that any financial harm it might experience if it were required to return to traditional rate regulation would justify interim relief. The presiding administrative law judge for the Commission informed the parties that the schedule for filing briefs and proposed orders on Ameritech's request for interim relief would be set forth in an order to be issued on October 15, 1997.

Instead of providing a briefing schedule on that date, the Commission entered a "Preliminary Order on Interim Relief" denying Ameritech's request for interim relief. The Commission found that "at least on an interim basis, some form of relaxed regulation is called for," but that continuing the maximum prices, or price caps, for BLS which were effective under Opportunity Indiana would not serve the public interest. R. at 1345–46. The Commission found that "[n]otwithstanding our belief that the evidence of record is sufficient for us to devise some form of interim alternative regulatory relief, we have reluctantly concluded that we, the parties, and the public at large would be better served if the parties would present additional testimony" on the appropriate interim alternative regulation plan. *Id.* at 1347. The

---

**6.** At a hearing on July 21, 1997, the Commission's presiding officer dismissed Ameritech's first presentation of its request for interim relief pursuant to Indiana Trial Rule 41(B). However, a Commission order subsequently reinstated Ameritech's request for interim relief.

Commission's Preliminary Order also set forth a list of elements almost identical to those found in Opportunity Indiana, which the Commission found could be part of the interim regulatory framework for Ameritech. Finally, the Commission set a public hearing for November 17, 1997 and provided the parties the opportunity to file additional testimony and post-hearing briefs.[7]

On October 29, 1997, Ameritech declined to file another request for interim relief, arguing that it had not requested a rate change in its petition and that the issue of a change in price caps for BLS was significant and could not be addressed properly in the expedited time frame provided. Ameritech also suggested that evidence concerning the appropriate level for BLS price caps could be presented in the main case on permanent relief, with the result that Ameritech would be subject to traditional regulation under Ind.Code § 8-1-2-1 *et seq.* until the Commission issued a final order on its request for permanent alternative regulatory relief.

On November 7, 1997, various parties prefiled testimony which was to be presented at the November 17 hearing. On November 12, 1997, Ameritech filed a motion to strike the prefiled testimony. Ameritech also sought termination of all Commission proceedings on Ameritech's request for interim relief. On November 19, 1997, the Commission denied Ameritech's motion to terminate interim relief proceedings. On November 25, 1997, the Commission issued an entry in which it vacated its previous procedural schedule, including the scheduled November 17, 1997 hearing,[8] and granted Ameritech's motion to strike the prefiled testimony. The Commission also directed the parties to file briefs and/or proposed orders based on the current evidence of record and taking into account the Commission's findings in its Preliminary Order.

On December 30, 1997, the Commission entered its Final Order on Interim Relief, in which it:

1. Adopted a new ratemaking concept using "a productivity offset to determine the appropriate level of a price cap" for the interim alternative regulatory structure;

2. Found that a productivity factor of 6.5%, less an inflation factor of 1.9%, should be used to reduce Ameritech's BLS price caps 4.6% from the levels in effect under Opportunity Indiana; and

3. Ordered Ameritech to reduce its rates for both residential and business BLS by 4.6%.

*Id.* at 2724-28. The Commission also found that Ameritech had not made the full amount of infrastructure investments required under Opportunity Indiana. Ameritech had presented evidence to the Commission that it had been unable to generate sufficient interest for the required investments among the schools, hospitals and government centers it served. The Commission ruled that if Ameritech was unable to generate sufficient interest to absorb the full amount of the infrastructure investment obligations in Opportunity Indiana, Ameritech should "propose some other means for its shareholders to provide infrastructure improvements consistent with [the terms of Opportunity Indiana]." *Id.* at 2731. The Commission's Final Order provides, in pertinent part:

---

7. The Commission's order gave Ameritech until October 29, 1997 to file additional testimony. All other intervenors were given until November 7, 1997 to file additional testimony. Ameritech was to have filed rebuttal testimony by November 12, 1997. All parties were given until November 26, 1997 to file post-hearing briefs and proposed orders and until December 3, 1997 to file exceptions to any other party's brief or proposed order.

8. In canceling the scheduled hearing and vacating its previous procedural schedule, the Commission stated "[w]e have concluded that there is not enough time to hold another hearing in time for the Commission to issue an order by the end of the year." R. at 2288.

2. Subject to other ongoing rate investigations, until such time as this Commission issues an Order addressing the remainder of Ameritech Indiana's Petition other than for interim alternative regulatory relief, and subject to our further review if no such Order has been issued by October 1, 1998, this Commission shall relax is [sic] jurisdiction to review Ameritech Indiana's earnings. Ameritech Indiana shall accordingly reduce by 4.6 percent the cap currently in place on its residential and business rates for basic local service.

3. Ameritech Indiana shall make infrastructure investments of no less than $150 million through 1999 in compliance with [Opportunity Indiana].

4. This Order shall be effective on and after the date of its approval.

*Id.* at 2732.

Ameritech appeals this Final Order. The OUCC cross-appeals, asserting that, among other things, the Commission failed to give adequate notice under Ind.Code § 8–1–2.6 *et seq.*

## STANDARD OF REVIEW

■ Under Ind.Code § 8–1–3–1, we employ a two-tier standard of review when determining whether an order of the Commission is contrary to law. First, we determine whether the Commission's order contains specific findings on all factual determinations which are material to its ultimate conclusion. *See Gary–Hobart Water Corp. v. Indiana Util. Regulatory Comm'n*, 591 N.E.2d 649, 652 (Ind.Ct.App. 1992); *Tell City v. Indiana Util. Regulatory Comm'n*, 558 N.E.2d 857, 859 (Ind.Ct. App.1990). Under this standard, the "findings of basic fact must reveal the [Commission's] analysis of the evidence and its determination therefrom regarding the various specific issues of fact which bear on the particular claim." *Perez v. United States Steel Corp.*, 426 N.E.2d 29, 33 (Ind.1981).

■ Second, we must determine whether there is substantial evidence in light of the whole record to support the Commission's specific findings of basic fact. *Gary–Hobart Water Corp.*, 591 N.E.2d at 652. The party appealing from a decision of the Commission bears the burden of showing that the Commission's findings in view of the entire record clearly lacked a reasonably sound basis of evidentiary support. *AFL–CIO, Cent. Labor Council of Vanderburgh, Posey and Warrick Counties v. Southern Ind. Gas and Elec. Co.*, 443 N.E.2d 1243, 1247 (Ind.Ct. App.1983). We will not reweigh or reanalyze the evidence presented or substitute our judgment for that of the Commission. *Gary–Hobart Water Corp.*, 591 N.E.2d at 652. However, we will reverse when our review of the whole record clearly indicates the agency's decision lacks a reasonably sound base of evidentiary support. *Id.*

■ Further, in addition to meeting these standards for findings and evidence, the Commission's decision must not be contrary to law. "[T]his court must also determine whether the Commission's decision, ruling, or order is contrary to law. Specifically, the Commission must stay within its jurisdiction and conform to the statutory and legal principles which must guide its decision, ruling, or order." *Id.* (citation omitted).

## ALTERNATIVE REGULATION STATUTE

Ind.Code § 8–1–2.6–2 provides in part:

(a) Notwithstanding any other statute, the [C]ommission may:

(1) on its own motion;

(2) at the request of the utility consumer counselor;

(3) at the request of one (1) or more telephone companies; or

(4) at the request of any class satisfying the standing requirements of [Ind. Code § ] 8–1–2–54;

enter an order, after notice and hearing, that the public interest requires the [C]ommission to commence an orderly process to decline to exercise, in whole or in part, its jurisdiction over telephone companies or certain telephone services.

(b) In determining whether the public interest will be served, the [C]ommission shall consider:

(1) whether technological change, competitive forces, or regulation by other state and federal regulatory bodies render the exercise of jurisdiction by the [C]ommission unnecessary or wasteful;

(2) whether the exercise of [C]ommission jurisdiction produces tangible benefits to telephone company customers; and

(3) whether the exercise of [C]ommission jurisdiction inhibits a regulated entity from competing with unregulated providers of functionally similar telephone services or equipment.

Ind.Code § 8–1–2.6–3 provides:

Notwithstanding any other statute, the [C]ommission may:

(1) on its own motion;

(2) at the request of the utility consumer counselor;

(3) at the request of one (1) or more telephone companies; or

(4) at the request of any class satisfying the standing requirements of [Ind. Code § ] 8–1–2–54;

adopt rules or by an order in a specific proceeding provide for the development, investigation, testing, and utilization of regulatory procedures or generic standards with respect to telephone companies or services. The [C]ommission shall adopt the rules or enter an order only if it finds, after notice and hearing, that the regulatory procedures or standards are in the public interest and promote one (1) or more of the following:

(1) Telephone company cost minimization to the extent that a telephone

company's quality of service and facilities are not diminished.

(2) A more accurate evaluation by the [C]ommission of a telephone company's physical or financial conditions or needs, as well as a less costly regulatory procedure for either the telephone company, its consumers, or the [C]ommission.

(3) Development of depreciation guidelines and procedures that recognize technological obsolescence.

(4) Increased telephone company management efficiency beneficial to consumers.

(5) Regulation consistent with a competitive environment.

These statutory sections grant two types of authority to the Commission. Under Section 2, the Commission may find that the public interest requires it to decline to exercise, in whole or in part, its jurisdiction over telephone companies or certain telephone services. Section 3 authorizes the Commission to use alternative regulatory procedures and generic standards, provided that it finds those procedures or standards serve the public interest and also promote one or more of the additional criteria given. Both sections require notice and hearing prior to Commission action.

## DISCUSSION AND DECISION

1. *Whether the Commission's Rate Reduction Was Unlawful*

Under traditional utility regulatory statutes, there is only one methodology for changing a utility's rates—the rate-of-return methodology described in *City of Evansville v. Southern Ind. Gas & Elec. Co.,* 167 Ind.App. 472, 478–82, 339 N.E.2d 562, 568–71 (1975). Under that traditional ratemaking methodology, the Commission must first find that a utility's existing rates are unjust and unreasonable; if it does, the Commission may then order just and reasonable rates to be charged in the future. Ind.Code § 8–1–2–68; *Indiana Tel.*

*Corp. v. Public Serv. Comm'n of Ind.,* 131 Ind.App. 314, 340, 171 N.E.2d 111, 124 (1960).

In this case, the Commission did not purport to find that existing rates were unjust and unreasonable under traditional ratemaking methodology. Rather, the Commission proceeded under the Alternative Regulation Statute, which does not by its language specifically grant ratemaking authority to the Commission. Any Commission authority to change a telephone utility's rates using the Alternative Regulation Statute must derive from Ind.Code § 8–1–2.6–3, which gives the Commission authority to develop and use alternative "regulatory procedures or generic standards" with respect to telephone companies or services.

The Alternative Regulation Statute contains safeguards which must be observed before the Commission can override traditional utility regulation statutes and substitute alternative procedures or standards. First, before using or imposing an alternative standard, the Commission must provide notice of the alternative ratemaking or other standard which it is considering adopting and then conduct a hearing on that alternative standard. Second, the Commission must make two types of specific findings: 1) the Commission must, upon consideration of certain factors, find that the proposed alternative regulation standard or procedure is in the public interest; and 2) the Commission must find that the proposed alternative regulation standard or procedure promotes one or more of the additional criteria enumerated in Section 3 of the Alternative Regulation Statute.

#### a. *Notice and Hearing*

■ Both Ameritech and the OUCC contend that the Commission did not comply with the notice and hearing requirements of the Alternative Regulation Statute before entering its Final Order on Interim Relief. We agree.

Ameritech's original petition did not request rate changes or use of any new alternative ratemaking standards other than those previously adopted in Opportunity Indiana. R. at 31–41. The scope of Ameritech's request for interim relief was even narrower. Ameritech requested the Commission to maintain the maximum price caps already in place under Opportunity Indiana and to continue both its declination of jurisdiction and the alternative procedures in place under Opportunity Indiana until the Commission could enter an order on Ameritech's petition for permanent relief. *Id.* at 871–81. Public notices published by the Commission in early September indicated that a hearing would be conducted September 30, 1997 on Ameritech's petition for interim relief. *Id.* at 1040–86.

In its Preliminary Order issued on October 15, 1997, the Commission rejected the suggestion that it was proceeding on its own motion and confirmed that it was proceeding on Ameritech's request for interim relief. *Id.* at 1340. It then proceeded to determine that some form of interim relief was appropriate and established a procedural schedule, including deadlines for parties to submit additional testimony and an evidentiary hearing scheduled for November 17, 1997. However, before this hearing was held, the Commission issued an entry which vacated the hearing and the procedural schedule. Parties were directed to file briefs and/or proposed orders based on the then current record taking into account the Commission's findings in its Preliminary Order. *Id.* at 2287–88, 2291.

In its petition that the Commission reestablish the vacated procedural schedule, the OUCC made the following argument that the Commission had violated various parties' rights to due process and to present evidence regarding the appropriate form of interim relief for Ameritech:

> No party could have properly responded to the infinite number of possible reasonable alternative regulatory plans pri-

or to the Commission's critical determination in its October 15, 1997 Order that some form of interim relief was appropriate.... Additionally, no party, including the OUCC could or should have been expected to anticipate the Commission's determination that interim relief should also take the form of an alternative regulatory plan, and not a return to rate of return regulation.

*Id.* at 2446–47.

We find this argument compelling. The Alternative Regulation Statute permits the Commission to adopt alternative regulatory procedures only after notice and hearing. We interpret this statute as requiring the Commission to give notice of the specific alternative regulatory procedure it is considering with sufficient specificity to allow interested parties to present evidence and participate in a hearing on that procedure. It is not sufficient for the Commission to give notice that it is considering some undecided form of alternative regulatory procedure.

In *Blue & White Serv., Inc. v. Public Serv. Comm'n of Ind.,* we held that if a party in a proceeding before the Commission does not have proper notice of the issues to be decided by the Commission as provided by law, then that party cannot be said to have had an opportunity to meet those issues with rebuttal evidence. 137 Ind.App. 112, 117, 205 N.E.2d 552, 554 (1965). In *Blue & White,* Wilbur Harris filed an application with the Commission requesting authority to transport property via intrastate commerce. Blue & White appeared as a protestant in that proceeding and appealed after the Commission granted Harris more extensive authority than he had requested in his application. We held that such a variance between the requested relief and the relief actually granted by the Commission had effectively denied Blue & White its legal right to offer evidence to the Commission in explanation of or in rebuttal to Harris' application. *Id.*

In this case, interested parties were given notice and a hearing was conducted only on the issue of whether interim relief for Ameritech was appropriate. The Commission did not identify any of the alternative regulatory procedures it was considering with sufficient specificity to allow interested parties to present evidence and be heard concerning the alternative procedures. The Commission did not give notice at any time that it was considering the new ratemaking standard using price caps linked to a productivity offset, which standard it eventually adopted in its Final Order. Further, the Commission did not conduct a hearing to consider evidence on this new standard before adopting it.

Further, the Commission's own actions effectively precluded interested parties from presenting evidence on what form the interim alternative regulatory structure for Ameritech should take. After a hearing on Ameritech's request for interim relief, the Commission informed parties it would enter an order by October 15, 1997 to set a schedule for parties to file briefs and proposed orders on Ameritech's request. Instead, the Commission proceeded to enter a preliminary order in which it decided the issue of whether interim relief was appropriate.

In the preliminary order, the Commission set a hearing and a procedural schedule for parties to submit testimony and file briefs and proposed orders on what form interim relief should take. However, the Commission subsequently vacated that order, struck prefiled testimony of interested parties from the record, canceled a scheduled hearing, and restricted interested parties to using evidence already in the record to make their arguments.

The Commission exceeded its authority under the Alternative Regulation Statute by adopting an alternative ratemaking procedure without affording interested parties sufficient hearing and notice to present evidence relevant to that procedure. As such, the Commission lacked authority to issue its Final Order.

### b. *Unsupported by Findings*

■ Ameritech further argues that the Commission's Final Order is unsupported by the findings required by the Alternative Regulation Statute.[9] We agree. The requirement of detailed findings covering all material basic and ultimate facts is essential, as it enables the court "to review intelligently the Commission's decision" and thereby ensure that the agency has stayed within its legal authority and jurisdiction. *See General Tel. Co. of Ind., Inc. v. Public Serv. Comm'n of Ind.,* 238 Ind. 646, 653, 150 N.E.2d 891, 895 (1958); *Perez,* 426 N.E.2d at 31–32. There is no finding in the Commission's Final Order that the price cap linked to a productivity offset "concept" adopted by the Commission is in the public interest under the factors set forth in Ind.Code § 8–1–2.6–3.

Further, the Commission's Final Order includes no finding that either the productivity offset ratemaking procedure or the specific price cap index adopted by the Commission promotes any of the additional criteria set forth in Ind.Code § 8–1–2.6–3. There is no finding or explanation why adoption of the price cap ratemaking standard using a productivity offset would provide a more accurate evaluation by the Commission of a telephone company's physical or financial conditions or needs. Neither is there a finding that the price cap linked to a productivity offset would promote a less costly regulatory procedure for the telephone company, its consumers, or the Commission. Similarly, there is no finding or explanation of why the Commission's use of a price cap linked to a productivity offset and BLS rate reductions are consistent with a competitive telecommunications environment. The Commission's Final Order is not adequately supported by the basic findings of fact required by

the Alternative Regulation Statute. As such, its Final Order is contrary to law.

In its Final Order, the Commission noted that without interim alternative regulation, there would be no immediate effect on Ameritech's rates when Opportunity Indiana expired and that it would need to proceed to traditional rate-of-return regulation to review whether Ameritech's rates resulted in unreasonable returns. R. at 2725. Although it noted that reducing BLS rates by some alternative mechanism would be in keeping with the Alternative Regulation Statute, the Commission did not provide notice, conduct a hearing, or make the statutorily-required findings to support the alternative mechanism it used to reduce BLS rates. As such, the Commission's Final Order exceeded its authority under the Alternative Regulation Statute. We reverse and remand for proceedings consistent with this opinion.

### 2. *Which Rate is Appropriate?*

■ Having decided the Commission's Final Order reducing Ameritech's rates was contrary to law, we now decide what rates the Commission should put in place on a temporary basis until it makes a determination consistent with this opinion on Ameritech's petition for interim relief.[10] In its Final Order, the Commission ruled that "unless we approve some form of alternative regulation Ameritech Indiana would revert to rate of return regulation." R. at 2725. The Commission stated that a return to traditional regulation after the expiration of Opportunity Indiana "would not immediately [a]ffect the rates Ameritech Indiana may charge" and that Ameritech's lawful rates under Opportunity Indiana "would continue to be its lawful rates...." *Id.*

---

9. The OUCC also argues that the Commission's Final Order is unsupported by sufficiently detailed findings. However, the OUCC's argument applies only to the Commission's actions which denied "the Public's right and ability to seek further review of the interim rates established by the Commission, pending the outcome of the permanent portion of the underlying [action]." Brief of the

OUCC at 10. We address this allegation of error elsewhere in this opinion.

10. We also acknowledge that a final determination by the Commission on Ameritech's petition for permanent relief would make the issue of interim relief moot.

We agree. That conclusion is directly compelled by Ind.Code § 8–1–2–44, which requires a public utility to charge the rates contained in its schedules on file with the Commission and provides that such rates are the utility's only lawful rates unless they are "changed as provided in [the Public Service Commission Act]." As discussed previously, the Commission can change Ameritech's rates only through traditional ratemaking methodology or after the notice and hearing required by the Alternative Regulation Statute. The rates which were on file with the Commission upon the expiration of Opportunity Indiana are Ameritech's lawful rates and remain in place until the Commission changes those rates through a proceeding which complies with the Alternative Regulation Statute or traditional ratemaking procedures.

### 3. Refund of Interim Rates

 The OUCC argues that the Commission erred in denying its request to make the interim rates subject to further review and refund.[11] We disagree. Ind. Code § 8–1–2–68 permits the Commission to set new rates only after finding, pursuant to proper notice and hearing procedures, that existing rates are unjust, unreasonable or otherwise unlawful. That statute permits the Commission to establish just and reasonable rates "to be imposed, observed and followed *in the future* . . . ." (emphasis added).

Our courts have repeatedly held that the Commission may not engage in retroactive ratemaking by entering orders retroactively setting rates:

We find nothing in the statute giving the Commission the power to cancel, or to fix, rates retroactively. The statute provides the Commission with the power to fix rates *for the future* if it finds the rates in effect to be unreasonable or unjust; but we look in vain to find statu-

tory authority for the Commission to fix rates *for the past* . . . .

We are satisfied that no utility could attract capital for expansion or replacement of its property and facilities, or for any other purpose, if the Commission could at one time fix rates for that utility and then at some later time rescind those rates retroactively, fix lower rates retroactively and require the difference to be refunded to the ratepayers. The law of Indiana was not designed or intended to create chaotic conditions in the market where utilities, as well as other businesses go to obtain capital for their legitimate business purposes.

*Indiana Tel. Corp.,* 131 Ind.App. at 340–41, 171 N.E.2d at 124 (citations omitted); *accord Airco Indus. Gases v. Indiana Mich. Power Co.,* 614 N.E.2d 951, 953 (Ind.Ct.App.1993); *Public Serv. Ind., Inc. v. Nichols,* 494 N.E.2d 349, 353 (Ind.Ct. App.1986); *Indiana Tel. Corp. v. Indiana Bell Tel. Co., Inc.,* 171 Ind.App. 616, 638, 358 N.E.2d 218, 224 (1976); *Sizemore v. Public Serv. Comm'n,* 133 Ind.App. 51, 61, 177 N.E.2d 743, 748 (1961).

 Past losses of a utility cannot be recovered from consumers nor can consumers claim a return of profits and earnings which may appear excessive. *Public Serv. Comm'n of Ind. v. City of Indianapolis,* 235 Ind. 70, 88, 131 N.E.2d 308, 315 (1956). The Commission had no authority to fix Ameritech's rates on an interim basis, rescind those rates after further review and require any overcharges to be returned to consumers. We thus decline the OUCC's invitation to find the Commission erred by not making Ameritech's rates subject to refund. It is not within the Commission's authority to allow a utility to engage in retroactive ratemaking.

### 4. Infrastructure Investments

 Ameritech argues that the Commission's Final Order is contrary to law

---

11. Specifically, the OUCC argues that the Commission's denial of its request to make the interim rates subject to refund was "not specific nor was it based upon substantial evidence of record." Brief of the OUCC at

15. Because we find that the Commission lacked authority to make Ameritech's interim rates subject to refund, we need not address these allegations of error.

because it rewrites Ameritech's infrastructure obligations under Opportunity Indiana. We disagree. Section 10 of the 1994 Opportunity Indiana agreement provides:

> 10. *Infrastructure Investments.* [Ameritech] shall make the following investments in infrastructure, with the express understanding that the value of such investments will not be subject to recovery through rates or charges for BLS and BLS–Related Services in any subsequent rate proceeding affecting BLS, if any, before the Commission:
>
>> a. $5 million per year for each year 1994 through 1999 to either the Corporation for Educational Technology or other similar non-profit corporation at [Ameritech's] sole discretion to fund information processing and telecommunications equipment, including but not limited to terminal equipment, hardware, applications software and training to permit eligible elementary and secondary schools in [Ameritech's] service area to take advantage of broadband and digital technology for voice, data, video and other applications.
>>
>> b. $20 million per year for each year 1994 through 1999 to provide digital switching and transport facilities including, where appropriate, fiber optic facilities, to every interested school, hospital and major government center in [Ameritech's] service area on a non-discriminatory basis. [Ameritech] agrees to provide proof of compliance with this provision on an annual basis to the Settling Parties, if requested.

Supplemental R. at 29–30.

During proceedings on its request for interim relief, Ameritech presented evidence that it had provided only $15.6 million of the infrastructure investments required by Section 10(b) of Opportunity Indiana. R. at 2730. Ameritech attributed this shortfall to its inability "to generate sufficient interest among the schools, hospitals and government centers it serves." *Id.*

In its Final Order on Interim Relief, the Commission found that Ameritech "has failed to live up to its infrastructure investment obligation." *Id.* The Commission then directed that if Ameritech "has trouble generating sufficient interest it should try harder, perhaps with the advice and assistance of other parties to the Settlement Agreement or of Indiana's Intelenet Commission, to generate interest in its provision of digital switching and transport facilities, or to otherwise propose some other means for its shareholders to provide infrastructure improvements consistent with [the terms of Opportunity Indiana]." *Id.* at 2731.

Opportunity Indiana did not state that Ameritech would make investments "up to" a maximum amount. Nor is there anything in Opportunity Indiana which suggests Ameritech's infrastructure investments were to be optional. It is clear from the language of the Opportunity Indiana settlement agreement that Ameritech undertook an unconditional commitment to make certain infrastructure investments that would be in effect for the six-year period of 1994 through 1999. Ameritech has not fulfilled that commitment. Therefore, we find no error with the Commission's Final Order requiring it to do so.[12]

## CONCLUSION

This court may set aside an order of the Commission, in whole or in part, or remand the proceeding to the Commission with instructions. *See* Ind.Code § 8–1–3–7(a). For the foregoing reasons, we reverse the portion of the Commission's Fi-

---

12. We acknowledge Ameritech's assertion that the Commission's order that it propose some other means for its shareholders to provide infrastructure investments consistent with Opportunity Indiana could alter the terms of the agreement and thus be contrary to law. The Opportunity Indiana settlement agreement would be interpreted under general principles of contract law. *See Carr v. Runyan,* 89 F.3d 327, 331 (7th Cir.1996), *cert.*

nal Order which adopts a price cap linked to a productivity offset form of alternative regulation and which orders a reduction in Ameritech's BLS rates. We remand those issues to the Commission for further proceedings consistent with this opinion. We affirm the Commission's Final Order denying the OUCC's request to make interim rates subject to refund. We also affirm the Commission's Final Order requiring Ameritech to comply with the infrastructure investment obligations set forth in Opportunity Indiana.

Affirmed in part, reversed and remanded in part.

SULLIVAN, J., and RILEY, J., concur.

_denied_, 519 U.S. 1117, 117 S.Ct. 962, 136 L.Ed.2d 848 (1996) ("A settlement agreement is merely a contract between parties to the litigation ... [a]s such, the formation, construction, and enforceability of a settlement agreement is governed by local contract law."). Courts, or in this case the Commission, retain the inherent power to enforce agreements entered into in settlement of the underlying controversy pending before them. _Silkey v. Investors Diversified Servs., Inc._, 690 N.E.2d 329, 332 (Ind.Ct.App.1997), _reh'g denied; Harding v. State_, 603 N.E.2d 176, 179 (Ind.Ct.App.1992).

We agree with Ameritech's assertion that it would be error for the Commission to require that it undertake investments not specified under the original terms of Opportunity Indiana. _See General Motors Corp. v. Northrop Corp._, 685 N.E.2d 127, 135 (Ind.Ct.App. 1997), _reh'g denied, trans. denied_ (courts do not have the power to create for parties a contract which the parties did not make, nor to insert language into a contract which was not inserted by the parties).

However, the Commission's Final Order orders Ameritech only to comply with its infrastructure investment obligations under Opportunity Indiana. It does not order Ameritech to invest additional funds or to make investments which were not specified by the terms of the settlement agreement. The Commission's order merely states that Ameritech may propose alternative methods by which it might provide the required infrastructure investments in a manner which

would comply with the terms and intent of Opportunity Indiana.

Further, Ameritech's failure to provide the infrastructure investments required by Opportunity Indiana could be seen as a breach of the settlement agreement. _See Strodtman v. Integrity Builders, Inc._, 668 N.E.2d 279, 282 (Ind.Ct.App.1996) ("A party breaches a contract either by placing itself in a position where it is unable to perform its contractual obligations, or by failing to perform all of its contractual obligations."). The measure of damages in a breach of contract case is the loss actually suffered as a result of the breach. _Sammons Communications of Ind., Inc. v. Larco Cable Const._, 691 N.E.2d 496, 498 (Ind. Ct.App.1998), _trans. denied_. Thus, if the Commission determines that Ameritech has breached its obligations under Opportunity Indiana, Ameritech could be liable for the damages which resulted from that breach of the agreement (i.e., return to the public of over $100 million in funds which were supposed to be made available for infrastructure improvements as well as any damages which might be proven by other settling parties under Opportunity Indiana).

If Ameritech is indeed unable to complete its obligations in accordance with the terms of Opportunity Indiana, it might wish to consider the possible effects of its breach when deciding whether it should voluntarily formulate alternative methods by which it could fulfill its infrastructure investment obligations.